

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
JAN 18 2008
Jan 18, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**ST. COLETTA'S OF ILLINOIS, INC., an Illinois not-for-profit corporation, and JESSE McMORRIS, an individual,**

**Plaintiffs,**

**v.**

**CITY OF MARKHAM, an Illinois municipal corporation, DAVID WEBB, JR., J.V. COOK, SR., THADDEUS GOODLOW and ROGER AGPAWA, individuals,**

**Defendants.**

**No. 08 CV 409**

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR ORDER OF MANDAMUS

Plaintiffs St. Coletta's of Illinois, Inc. ("St. Coletta's") and Jesse McMorris ("Jesse") (collectively, "Plaintiffs"), by counsel Nicholas Anaclerio, Jamie A. Robinson and David Levitt of Ungaretti & Harris LLP, submit this memorandum of law in support of the Petition for A Writ of Mandamus stated in their Complaint herein against the City of Markham (the "City" or "Markham"), its Mayor David Webb, Jr., its Planning Commission Chairman J.V. Cook, Sr., its Residential Building Inspector Thaddeus Goodlow and its Deputy Fire Chief Roger Agpawa (with the City sometimes collectively referred to as "Defendants"):

## INTRODUCTION

Plaintiffs seek the immediate issuance of a writ of mandamus compelling Defendants to issue permits allowing St. Coletta's to install a sprinkler system and a fire alarm system at a single family home owned by St. Coletta's which is located at 16207 South Central Park in the

City of Markham (the "Home"). Their right to this relief is clear and free from doubt, and the requested writ is critical to ready the Home for occupancy and to prevent Plaintiffs and the other disabled prospective residents of the Home from being rendered homeless on February 1, 2008.

**UNCONTESTED FACTS**

St. Coletta's is an Illinois not-for-profit corporation founded by the Sisters of St. Francis of Assisi and provides a variety of services to developmentally disabled adults and children, including the operation of assisted-living residential group homes. (Affidavit of Ray Bryan, hereinafter "Bryan Affidavit," ¶ 2, attached as Exhibit 1.) Jesse is a developmentally disabled adult who presently lives with three other disabled persons (collectively, the "Residents") at a residence operated by St. Coletta's. (Bryan Affidavit, ¶ 12.) The lease on Jesse's current residence expires on January 31, 2008, at which time St. Coletta's and the Residents must vacate it. (*Id.*, ¶ 13.) St. Coletta's purchased the Home on November 3, 2007 for the purpose of opening a new group home for the Residents to move into when their current lease expires. (*Id.*, p. ¶¶ 5-6, 12-13.)

On November 21, 2007, St. Coletta's through its agents and/or contractors applied to the City for permits to install a fire alarm system and a sprinkler system, which work must be done in accordance with Illinois law, though *not* Markham ordinance, by January 31 so that the Residents can move into the Home. (*Id.*, ¶ 16.) St. Coletta's submitted all necessary documentation, along with the requisite fee payment for the permits. (*Id.*, ¶ 16.) Despite this, Defendants have refused to issue any permits unless and until St. Coletta's has obtained a business license and petitioned the City for zoning approval of the use of the Home as a group home. (*Id.*, ¶ 17.) But Markham's ordinances do not require further zoning approval, a special use permit, a zoning variance or a business license for St. Coletta's to use the Home for its

intended purpose, as a residential group home. (*See* Exhibit 2, hereto, pertinent portions of Markham's Code of Ordinances, the "Code".) Markham's ordinances also do not condition the issuance of a permit upon an applicant first presenting a business license, demonstrating zoning approval or anticipated use in conformity with existing zoning. Ex. 2.

St. Coletta's repeated requests for the permits, and its subsequent efforts to obtain the business license and zoning approval that Defendants claim are necessary, have all been frustrated and refused by Defendants to date. (Bryan Affidavit, ¶ 34.) Defendants have never disputed that St. Coletta's permit applications fully comply with Markham's requirements. (*Id.*, ¶ 35.) Instead, the Defendants have steadfastly refused to issue the permits based solely upon an incorrect claim that St. Coletta's must have a business license, a zoning approval, or both, before the permits may issue. (*Id.*, ¶ 17.)

Defendants are in plain violation of the unambiguous terms of the Code respecting the issuance of permits, and have thus far failed and obdurately refused to discharge their clear ministerial duty to issue the permits to St. Coletta's. A writ of mandamus is fully appropriate to compel them to a non-discretionary action required by law, issuance of the permits.

**ARGUMENT**

This Court should grant Plaintiffs' request for a writ of mandamus compelling the Defendants to issue the permits in question as it has the power to issue such a writ against a municipality and its agents under Illinois law under the indisputable facts presented here. *See, e.g., Iowa Wireless Servs., L.P. v. City of Moline*, 29 F. Supp. 2d 915, 924 (C.D. Ill. 1998) (wherein the District Court ordered the city of Moline to issue a special use permit). To establish a right to a writ of mandamus under Illinois law, a plaintiff must show a clear, affirmative right to relief, a clear duty of the defendant to act, and clear authority in the defendant to comply with

the writ. *Boyd v. Illinois State Police*, 384 F.3d 888, 896-97 (7th Cir.2004); *Meer v. Graham*, No. 07 C 1058, 2007 WL 2908822, *9 (N.D. Ill., Oct. 4, 2007).

"Mandamus is a proper remedy to require the issuance of a building permit where the only objection thereto is made under the municipal zoning ordinance and where that ordinance is inapplicable to the property in question . . . since under those circumstances the act of issuing the building permit becomes ministerial only and no discretion is involved." *Wehrmeister v. Carlman*, 17 Ill. App. 2d 171, 184, 149 N.E.2d 453, 460 (Ill. App. Ct. 1958). In order to compel the issuance of a permit by mandamus, a plaintiff must show that the refusal to issue the permit was improper and that it complied with proper application procedures. *Heerey v. City of Des Plaines*, 225 Ill. App. 3d 203, 215, 587 N.E.2d 1119, 1126 (Ill. App. Ct. 1992).

**A.      St. Coletta's has a Clear, Affirmative Right to Relief**

As noted in the foregoing Statement of Uncontested Facts, St. Coletta's has a clear, affirmative right to the permits. It owns the Home. (Bryan Affidavit, ¶ 5). Upon purchasing the Home, it received a Certificate of Occupancy certifying that the structure met the requirements of the City's housing ordinances. (*Id.* ¶ 6.) Thereafter, St. Coletta's applied for two permits, to install water sprinklers and a fire alarm system. (*Id.* ¶ 16.) In so doing, St. Coletta's indisputably paid the proper fee and complied with all instructions that it received from the City and its agents. (*Id.*)

**B.      The Defendants have a Clear Duty to Act and the Ability to Act**

The Defendants have failed to discharge their clear duty to issue the permits. (Bryan Affidavit, ¶¶ 19-23, 29-33.) They have offered no legitimate basis for refusing to issue the permits and for blocking the installation of a fire alarm and sprinkler system at the Home (a refusal which places the Home's residents and the structure itself at increased risk of harm).

Instead, the Defendants have inappropriately sought to condition the granting of the permits on St. Coletta's securing a legally unnecessary business license, a zoning approval, or both. (*Id.* ¶ 17.) There is no basis in the Code or elsewhere for these requirements serving as pre-conditions to granting a permit. Because, as a matter of law, the ordinances at issue require issuance of the permits and do not justify Defendants in withholding them, the act of issuing the permits is entirely ministerial and requires no discretion. Thus a writ of mandamus is proper.

**1. The Group Home is Permitted Under the Current Zoning Code.**

The Defendants have maintained that St. Coletta's needs a special use permit to operate the Home as a residential group home. They are wrong. There is no dispute that the Property is in a residentially zoned district, which permits one-family dwelling. Ex. 2. The Code defines "family" as "[a] group of one or more persons occupying a building and living and cooking in a single dwelling unit. *No unrelated group living and cooking in a single dwelling unit shall consist of more than six persons* . . . ." Code, §156.03 (emphasis added), Ex. 2. It is undisputed that the Home will be occupied by six, and no more than six, unrelated persons – the Residents. The Residents will not use the Home for any purpose other than as a domicile. This is plainly a permitted use.

**2. No Business License is Required.**

The Defendants' other excuse for refusing to issue the permits is the purported need for St. Coletta's to obtain a business license. But St. Coletta's is not a "business" as that term is used in the Code, which defines "business" as "vocations, occupations, professions, enterprises . . . which are conducted for *private profit, or benefit, either directly or indirectly* . . . ." Code, §110.03, Ex. 2. St. Coletta's is a not-for-profit corporation that receives state and federal funding, supplemented by private donations that runs state programs for disabled adults and

children. It will not engage in any activity for private profit or benefit at the Home. Moreover, the Code also defines the kinds of activities for which a business license *is* needed, and neither St. Coletta's nor its Residents will engage in any of the enumerated activities at the Home. Code, §110.15(B)(1)(a-g), Ex. 2.

**CONCLUSION**

For all of the foregoing reasons, the Plaintiffs respectfully request that this Court immediately issue a writ of mandamus to the Defendants compelling them to issue to Plaintiffs the applied-for permits forthwith, together with such other or additional relief in Plaintiffs' favor and against the Defendants as this Honorable Court deems fair, just and equitable in the premises.

Dated: January 18, 2008

Respectfully submitted,

Nicholas Anaclerio (ARDC #6187889)
Jamie A. Robinson (ARDC #6270503)
David Levitt (ARDC #6280466)
UNGARETTI & HARRIS LLP
Three First National Plaza
Suite 3500
Chicago, Illinois 60602
Telephone (312) 977-4400
Facsimile (312) 977-4405

Counsel for Plaintiffs

1

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ST. COLETTA'S OF ILLINOIS, INC., an Illinois not-for-profit corporation, and JESSE McMORRIS, an individual,**<br><br>**Plaintiffs,**<br>**v.**<br><br>**CITY OF MARKHAM, an Illinois municipal corporation, DAVID WEBB, JR., J.V. COOK, SR., THADDEUS GOODLOW and ROGER AGPAWA, individuals,**<br><br>**Defendants.** | ) | **No. 08 CV 409** |

**AFFIDAVIT OF RAY BRYAN**

I, Ray Bryan, being over the age of 18, and first duly sworn, do state upon oath as follows:

1. I have personal knowledge of the facts contained herein and if called to testify would testify to the same.

2. St. Coletta's is an Illinois not-for-profit corporation founded by the Sisters of St. Francis of Assisi and provides a variety of services to developmentally disabled adults and children, including the operation of assisted-living residential group homes.

3. I am the Director of Residential Services at St. Coletta's.

4. St. Coletta's owns and since 1994 has operated a residential group home located at 3829 West 154th Place in Markham, Illinois (the "Zolecki Home"). The Zolecki Home was not required to obtain a business license prior to its opening or at any time during its operation from 1994 to the present.

5. On or about November 3, 2007, St. Coletta's purchased a single family residence, for the purpose of opening a group home for six (6) developmentally disabled persons (the "Home").

6. Upon purchasing the Home, St. Coletta's received a Certificate of Occupancy certifying that the structure met the requirements of the City's housing ordinances. A copy of the Certificate of Occupany is attached as Exhibit A.

7. The Home is intended for 6 adult males who are developmentally, and in one case physically, disabled.

8. St. Coletta's will provide 24-hour supervision for the residents, in three 8 hour shifts by employees of St. Coletta's who do not reside or sleep at the Home. The employees also provide transportation services and assistance with activities of daily living, such as cooking and cleaning, paying bills and facilitating social interaction.

9. St. Coletta's has entered into contracts with six individuals or their guardians for spots at the Home.

10. One of the contracts is between St. Coletta's and Jesse McMorris ("Jesse"). Pursuant to the contract, Jesse is scheduled to move into the Home on February 1, 2008.

11. Jesse is developmentally disabled and mildly retarded.

12. Currently, Jesse lives with 3 other developmentally disabled individuals at an apartment located at 18131 South 66th Court in Tinley Park, Illinois. Three of those individuals have been with St. Coletta's and at that apartment for over 10 years.

13. St. Coletta's rents this apartment for its clients and its lease expires at the end of January 2008.

14.    All of the residents from the 18131 South Court address in Tinley Park are scheduled to move into the Home at the beginning of February.

15.    St. Coletta's does not have other suitable housing available for Jesse or the other residents that are scheduled to move into the Home.

16.    On or about November 21, 2007, St. Coletta's through its agents and/or contractors applied to the City for a permit for the installation of a fire alarm system and sprinkler system, which work must be done in accordance with Illinois law.   Copies of the applications are attached as Group Exhibit B.

17.    On November 30, 2007, Jerry Golk ("Jerry") and I went to the City Hall and were informed by the Residential Building Inspector, Thaddeus Goodlow ("Goodlow") that before receiving the permits, St. Coletta's would have to obtain a business license and petition the City for approval of the use.

18.    On or about November 30, St. Coletta's filed its petition for approval, its application for a business license and a $500 filing fee and asked that the Planning Commission meeting be expedited because the Home needed to be fully operational by the end of January. Copies of the petition, application and filing fee are attached as Group Exhibit C.

19.    St. Coletta's received no response from the City after filing its petition or its application for a business license and the City failed to expedite the meeting.

20.    On or about December 11, 2007, counsel for St. Coletta's and I inquired with the City about the status of St. Coletta's petition and application and the date of the special Planning Commission meeting.

21.     Mr. Goodlow told us that the paperwork was misplaced and not processed, that he would try to get the petition expedited and that at least St. Coletta's would be on the next regular meeting agenda scheduled for January 9, 2008.

22.     Mr. Agpawa joined the meeting and stated that he had no problems or issues with the Zolecki Home, but advised us that he could not issue the permits without the necessary license and approvals.

23.     A special Planning Commission meeting was not expedited.

24.     On January 9, 2008, I appeared with Wayne Kottmeyer and counsel on behalf of St. Coletta's before the City's Planning Commission.

25.     At the meeting, we learned that prior to the meeting, the Planning Commission received a report by a consultant hired by the City.

26.     The report was not provided to us either before or at the hearing.

27.     Although St. Coletta's does not have a copy of this report, it was represented at the hearing that the consultant recommended that the Planning Commission reject St. Coletta's petition for approval because the Property is a non-conforming use for which zoning approval is required.

28.     The Planning Commission's newly appointed attorney suggested that the Planning Commission needed additional time to consider the conclusions of the consultant in order to issue her legal opinion to the Commission.

29.     At the meeting, we were also told by the Planning Commission that in order to get a special Planning Commission meeting, we would have to pay an additional $250.00.

30.     The outcome of the meeting resulted in the Planning Commission's refusal to address St. Coletta's requests, refusal to make any recommendation to the City Council and

refusal to authorize the addition of St. Coletta's to the City Council's meeting agenda for January 16, 2008.

31. St. Coletta's petition was tabled until the next regularly scheduled planning commission meeting.

32. On January 10, 2008, we paid the additional fee for a special Planning Commission meeting. A copy of the check is attached as Exhibit D.

33. Even though St. Coletta's has paid an additional $250.00 fee for a special Planning Commission meeting, no such meeting has been scheduled.

34. St. Coletta's repeated requests for the permits, and its subsequent efforts to obtain the business license and zoning approval that Defendants claim are necessary, have all been frustrated and refused by Defendants to date.

35. The City has never disputed that St. Coletta's permit application fully complied with the City's requirements.

36. On or about January 9, 2007, I was informed that the Mayor of the City instructed the City to turn off the water to the Property without notice to St. Coletta's, even though there was no delinquency in the water bill payments.

FURTHER AFFIANT SAYETH NOT

Ray Bryan

Subscribed and Sworn to
before me this 18th day of January, 2008

Notary Public

OFFICIAL SEAL
GEORGENE A. NASH
Notary Public - State of Illinois
My Commission Expires Dec 04, 2010

1080938-2

A

Telephone: 708-331-4905
Fax: 708-331-9250
Fire/Police: 911

Non-emergency: 708-339-8877

# CITY OF MARKHAM

16313 KEDZIE PARKWAY-MARKHAM, ILLINOIS -60428

David Webb, Jr.
Mayor

Cheri Coles
City Clerk

Karen Cohn
Treasurer

## *CERTIFICATE OF OCCUPANCY*

***DATE:*** 11/01/07 M.T.

***ADDRESS:*** 16207 Central Park

*This is to certify that an inspection has been completed on the above property. As of this date, this structure meets the requirements of the City of Markham Housing Ordinance #05-0-1839.*

*The City of Markham holds no responsibility for any violations that may occur after this date of inspection.*

***CERTIFICATE VALID FOR THIRTY (30) DAYS ONLY & WILL NOT BE UPDATED***
***Re-Inspection fee of $30 is required if this certificate expires before closing or signing of lease.***

*Thaddeaus Goodlow, Building Inspector*

NEW

B

Markham Illinois 60428

Phone (708) 331-4905 ext. 223/242 Fax: (708) 331-8607

*For City Use Only:*

Application Date: ______ Application Fee: $ ______ License Fee ______
Approved Date: ______ Period Covered: ______ Zoning: ______
Category: ______ Type: ______

Please check one: New Operation X Name Change ____ Address Change ____ Owner Change ____

Application must be completed in its entirety before it is submitted for City Council approval. Failure to complete entire form and submit all required documents will result in delay of the application review process.

PLEASE PRINT OR TYPE CLEARLY

Name of Business: St. Coletta's of Illinois, Inc.
Address: 16207 South Central Park
City: Markham State: IL Zip: 60426

*Please check one:* Sole Proprietor: ____ Corporation: X Partnership: ____

Primary Emergency Contact: Jerry Golk
Business Phone # (708) 342-5200 Emergency # (708) 514-6063

State Tax # 9965 2803-04 (F)EIN # 36 217 17 35

Owner/Remit To Name (If different from Above): St. Coletta's of Illinois Foundation
Address: 18350 Crossing Drive
City: Tinley Park State: IL Zip: 60487 Phone #:(708) 342-5200

Person in Charge Name: Wayne Kottmeyer
Address: 18350 Crossing Drive
City: Tinley Park State: IL Zip: 60487
Please check one: Manager: ____ Corporate Office: X Phone #: (708) 342-5239

Property Owner Name (If different then owner/remit to): ______
Address: ______
City: ______ State: ____ Zip: ______ Phone #:( ) ______

PRINCIPLE ACTIVITY/SERVICES: CILA Group Home

# OF EMPLOYEES See below # OF VENDING/COIN OPERATED MACHINES None

Residence will house six high-functioning developmentally challenged individuals. A staff person will be present when building is occupied.

Business License

(1)

| Days/Hours of Operation | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|
| (24) Open | | | | | | | |
| Hours | | | | | | | |

Not applicable -- Normal residential occupancy

Fire Alarm on Premises? Yes Sprinklers on Premises? Yes Type of Alarm

Alarm Co DMC Security Phone # (708) 388-6500

Additional Information – Please complete if available:

Date Founded: 2007 Type of Building: Residential Square footage: 2200

Number of Units: 1 Zoning: R-1 Parcel ID 2823204001 0000

I certify that the above furnished information is true and correct. This application is being furnished to the prescribed authorities of the City of Markham as evidence to induce such authorities to issue a business license for the purpose indicated herein, in conformity with the current effective ordinances and rates therein.

Print Name Wayne Kottmeyer Title Executive Director

Signature [signature] Dated November 28, 2007

*SUBMISSION OF THIS APPLICATION AND FEES DOES NOT INDICATE THAT A LICENSE HAS BEEN APPROVED OR ISSUED. NO BUSINESS OPERATIONS SHALL BE TRANSACTED UNTIL THE APPROPRIATE LICENSE HAS BEEN APPROVED BY THE CITY OF MARKHAM*

***FOR OFFICE USE ONLY***

FIRE INSPECTION REPORT

_______ All requirements met/occupancy permitted
_______ No compliance/no occupancy

Comments ____________

Inspected by: ____________ Date: ____________

BUILDING INSPECTION REPORT

_______ All requirements met/occupancy permitted
_______ No compliance/no occupancy

Comments ____________

Inspected by ____________ Date: ____________

IF NEEDED Health ______ Electric ______ Plumbing ______

Business

(2)

CITY OF MARKHAM
*** CUSTOMER RECEIPT ***
DATE: 11/28/07 TIME: 16:24:33

| DESCRIPTION | PAY CD | | AMOUNT |
|---|---|---|---|
| APPLICATION FEE | CK | | 10.00 |
| -ST COLETTA'S OF ILLI | | 4283 | |
| FIRE INSPECTION | CK | | 50.00 |
| -16207 CENTRAL PK | | 4283 | |

TOTAL AMOUNT DUE 60.00
AMOUNT TENDERED 60.00
CHANGE DUE .00

TRANS #: 44 CASHIER CODE: CEM
BATCH #: C071128 REGISTER ID: FRT

ST. COLETTA'S OF ILLINOIS, INC.

DETACH AND RETAIN THIS STATEMENT
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW.
IF NOT CORRECT PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED.
DELUXE BUSINESS FORMS 1+800-328-0304 www.deluxeforms.com
DELUXE - FORM TWCB-3 V-2

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 11/28/07 | Business License Application<br>674-9000-000 | $60.00 |

V-2

# City of Markham

16313 Kedzie Parkway
Markham, IL 60428
County of Cook

In the matter of the petitioner:

(Name): Wayne Kottmeyer (Phone #) 708-342-5239
(Company name): St. Coletta's of Illinois, Inc (Phone #) 708-342-5200
(Address): 18350 Crossing Drive, Tinley Park, IL 60487
Home Owner: St. Coletta's of Illinois Foundation

Please specify additional affiliates, companies, corporations, and/or partnership involved in this proposed request, if none, indicate.
Sisters of St. Francis of Assisi

Petitioner is seeking approval for: Operation of a permitted use dwelling unit for six unrelated developmentally disabled individuals

- ☐ Annexation only
- ☐ Annexation and rezoning from ________ to ________
- ☐ Rezoning from ________ to ________
- ☐ Variance from current zoning ________ to ________
- ☐ Non conforming use
  Current land or structure use: ________
- ☐ Dedication
- ☐ Special-use permit
  Current zoning ________ proposed use: ________
- ☐ Planned Unit Development (PUD)
- ☐ Subdivision (land divided into 2 or more lots, parcels, units, or interests)
- ☐ Vacate

Property Index Number(s): 28-23-224-002-0000
Common Address of the property: 16207 South Central Park, Markham, IL 60426
Name of Title Holder: St. Coletta's of Illinois Foundation

For the purpose of: Establishment of a single dwelling unit for six handicapped individuals

The undersigned states to the Planning Commission of the City of Markham, County of Cook that he/she is the ☐ owner ☒ legally authorized agent and that the statements and supporting illustrations, if any, are true and accurate regarding this request for change and/or use of the proposed.

(Signature) [signature]
(Print) Wayne Kottmeyer

Planning

CITY OF MARKHAM
*** CUSTOMER RECEIPT ***
DATE: 11/30/07 TIME: 11:21:27

| DESCRIPTION | PAY CD | | AMOUNT |
|---|---|---|---|
| PLAN COMM | CK | | 500.00 |
| -ST COLLETTA OF ILL | | 4285 | |
| PLAN COMM | CK | | |
| - | | 4285 | |

| | |
|---|---|
| TOTAL AMOUNT DUE | 500.00 |
| AMOUNT TENDERED | 500.00 |
| CHANGE DUE | .00 |

TRANS #: 47 CASHIER CODE: CEM
BATCH #: C071130 REGISTER ID: FRT

CITY OF MARKHAM
BUILDING DEPARTMENT
ANNETTE WILLIAMS
License Clerk/Secretary

16313 Kedzie Parkway
(HONORABLE EVANS R. MILLER PARKWAY)
Markham, Illinois 60428

708.331.4905 Ext. 2
Fax 708.331.86

C

CENTRAL STATES AUTOMATIC SPRINKLERS, INC.
13740 South California Ave. ~ Blue Island, IL 60406
708-489-9400 Established 1974 Fax: 708-489-9494

Page One

FAXED

October 24, 2007

Aladdin Development
ATTN Sam Shuman/Rich Wagner
Fax # (708) 229-2850/(708) 359-8250

RE: **Fire Protection**
**16207 South Central Park**
**Markham, IL**

Dear Gentlemen:

We have reviewed the drawings # 3481 and done a site survey for the above referenced location. Based upon this information, our price to design & install a wet pipe sprinkler system is **THIRTEEN THOUSAND THREE HUNDRED FORTY ($ 13,340.00) DOLLARS.**

**Items Included:**
Design & install a wet pipe sprinkler system consisting of approximately (40) sprinklers.
System design will conform to NFPA # 13.
Supply a backflow preventer.
Install a water storage tank.
Install a residential booster pump.
Install a fire department connection on outside wall.
Install a water flow alarm switch.
Install a water pressure gauge in the system riser.
Install control valves.
Pipe & fittings for the first & second floors will be CPVC plastic.
Pipe & fittings for the basement will be copper.
Install NFPA approved hangers & supports.
Install an Emergency Sprinkler box with spare sprinklers & sprinkler wrench.
Install all required identification signs.
Install auxiliary drains as required.
Install a 1" main drain / inspectors test valve & route drainpipe to adequate floor drain.
Install wall plates around openings where pipes pass through finished walls.
Supply inside & outside alarm bells to buyer's electrician.
Prepare & submit sprinkler drawings & calculations to the Markham Fire Department and State Fire Marshall for approval.
Provide sprinkler system operation & maintenance training.
Insurance, hoisting, coring, fire stopping, union labor, coordination & clean up.

October 24, 2007

Aladdin Development
ATTN: Sam Shuman/Rich Wagner
Fax # (708) 229-2850

**RE: Fire Protection - Continued**
**16207 S. Central Park**
**Markham, IL**

**Items Not Included:**
Fire alarm or monitoring equipment.
Electrical wiring.
Permit or plan review fees.
Wall or ceiling openings.
Soffits.
Patching or repairing finished walls, ceiling, etc.
Freeze protection.

Thank you for considering Central States for your fire protection service. If you have any questions, please call.

Sincerely,
CENTRAL STATES AUTOMATIC SPRINKLERS, INC.
Ken Bozinovich (m.n.)
Kenneth R. Bozinovich

## Acceptance

**Contract Amount: Thirteen Thousand Three Hundred Forty ($ 13,340.00) Dollars**

**Terms:** Progress payments equaling 90% of completed work, invoiced at the end of each month, due within 15 days. Retention is due within 30 days after substantial completion of sprinkler system.

The above specifications, prices, & terms are satisfactory. You are hereby authorized to do the work as specified. Payment will be made as outlined above.

Accepted: ______________________ / ______________________
Signature Please Print Name

Title: ______________________ Date: ______________________

KRB/mn

FIRE ALARM SYSTEM

DMC

**SECURITY SERVICES, INC.**

4455 W. 147th Street
Midlothian, IL 60445
(708) 388-6500

CUSTOMER PROPOSAL AND SERVICE AGREEMENT

This Agreement made this 21ST Day of NOVEMBER, 2007 by and between D.M.C. Security Services, Inc. hereinafter called DMC and ST. COLETTA'S OF ILLINOIS - MARKHAM herein after called the Customer. DMC proposes to install or cause to be installed this equipment and furnish the services indicated herein at

Address 16207 CENTRAL PARK

City MARKHAM State IL 60428 Telephone No. ______

**TYPE OF TRANSACTION:**

1. ☒ OUTRIGHT SALE — Equipment to become property of the customer upon payment of selling price indicated below in full.

2. ☒ SYSTEM TO REMAIN THE PROPERTY OF DMC. Radio only
DMC, as specified in the schedule of protection may remove or upon written notice to the Customer, abandon in whole or in part, all devices, instruments, appliances, cabinets and other materials associated with the system, upon termination of this agreement, without obligation to repair or redecorate any portion of the Customer's premises upon such removal, and that the removal or abandonment of such materials shall not be held to constitute a waiver of the right of DMC to collect any charges which have been accrued or may be accrued hereunder.

**SERVICES TO BE PROVIDED** Circle One: P - Provided NP - Not Provided

Signal Receiving & Notification (P) NP

By ☐ Leased Telephone Line Charges ☐ Included ☐ Not Included

Direct Connection To ______

☒ Digital Communicator ☒ Radio ☐ Other ______

Service: (P) NP Investigator Response: INTERIOR P (NP) EXTERIOR P (NP)

Opening/Closing Logging P (NP) Supervised Opening/Closing P (NP)

Opening/Closing Reports P (NP) Alarm Verification Service P (NP)

Monitoring of ☐ Burglar Alarm ☒ Fire Alarm ☐ Other ______

☐ Extended Warranty Service

B. For the sum of FORTY-EIGHT HUNDRED NINETY - - - - - - - - - Dollars $ 4890.00

payable 50% upon acceptance of this proposal and the balance payable upon completion of the installation. In addition for the service(s) to be provided as indicated. Customer agrees to pay the sum of SIX HUNDRED SIXTY ANNUALLY($55/MO)- - - - Dollars $ 660.00

**per annum, quarterly in advance for a period of five years effective from the date service is operative under this agreement and thereafter shall continue for two (2) year periods.** This agreement is terminable only upon written notice by registered or certified mail, made at least thirty (30) days prior to the expiration date of the initial period or any renewal period. DMC shall have the right to increase the annual service charge after 1 year. If customer is unwilling to pay any such increase over ten (10) percent annually and notifies DMC in writing at least thirty (30) days prior to the effective date of such increase, DMC shall be permitted, at its sole option, upon written notice to customer to terminate this agreement as if the term had expired. Failure to notify DMC in writing at least thirty (30) days prior to the effective date of increase will constitute customers acceptance to the increase and all of the other terms and conditions of this agreement shall remain in full force and effect.

C. The customer agrees to pay, in addition to the service charges above, any false alarm assessments, taxes, fees or charges that are imposed by any governmental body, relating to the installation or service provided under this Agreement and to pay any increase in charges to DMC for facilities required for transmission of signals under this Agreement. In the event DMC's representative is sent to the Customer's premises in response to a service call or alarm signal caused by the Customer improperly following operating instructions or, failing to close or properly secure a window, door or other protected point, or improperly adjusting monitors or accessory components, there shall be a service charge to the Customer. Failure to pay amounts when due shall give DMC in addition to any other remedies, the right to charge interest at the highest legal rate on the delinquent amounts. Any installation charge quoted in this agreement is based on DMC performing the installation with its own personnel. If for any reason this installation must be performed by outside Contractors, said installation charge shall be subject to revision.

SCHEDULE OF PROTECTION (Attached Form 778)

**D. IT IS UNDERSTOOD THAT DMC IS NOT AN INSURER, THAT INSURANCE, IF ANY, SHALL BE OBTAINED BY THE CUSTOMER AND THAT THE AMOUNTS PAYABLE TO DMC HEREUNDER ARE BASED UPON THE VALUE OF THE SERVICES AND THE SCOPE OF LIABILITY AS HEREIN SET FORTH AND ARE UNRELATED TO THE VALUE OF THE CUSTOMER'S PROPERTY OR PROPERTY OF OTHERS LOCATED IN CUSTOMER'S PREMISES; DMC MAKES NO GUARANTY OR WARRANTY, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS, THAT THE SYSTEM OR SERVICES SUPPLIED, WILL AVERT OR PREVENT OCCURRENCES OR THE CONSEQUENCES THEREFROM, WHICH THE SYSTEM OR SERVICE IS DESIGNED TO DETECT. IT IS IMPRACTICAL AND EXTREMELY DIFFICULT TO FIX THE ACTUAL DAMAGES, IF ANY, WHICH MAY PROXIMATELY RESULT FROM FAILURE ON THE PART OF DMC TO PERFORM ANY OF ITS OBLIGATIONS HEREUNDER. THE CUSTOMER DOES NOT DESIRE THIS CONTRACT TO PROVIDE FOR FULL CONSEQUENCES THEREFROM, WHICH THE SERVICE OR SYSTEM IS DESIGNED TO DETECT OR AVERT; THAT IF DMC SHOULD BE FOUND LIABLE FOR LOSS, DAMAGE OR INJURY DUE TO A FAILURE OF SERVICE OR EQUIPMENT IN ANY RESPECT, ITS LIABILITY SHALL BE LIMITED TO A SUM EQUAL TO TEN PERCENT OF THE ANNUAL SERVICE CHARGE OR $500.00, WHICHEVER IS GREATER AS THE AGREED UPON DAMAGES AND NOT AS A PENALTY, AS THE EXCLUSIVE REMEDY; AND THAT THE PROVISIONS OF THIS PARAGRAPH SHALL APPLY IF LOSS, DAMAGE OR INJURY IRRESPECTIVE OF CAUSE OR ORIGIN, RESULTS DIRECTLY OR INDIRECTLY TO PERSON OR PROPERTY FROM PERFORMANCE OR NONPERFORMANCE OF OBLIGATIONS IMPOSED BY THIS CONTRACT OF DMC, ITS AGENTS OR EMPLOYEES. NO SUIT OR ACTION SHALL BE BROUGHT AGAINST DMC MORE THAN ONE (1) YEAR AFTER THE ACCRUAL OF THE CAUSE OF ACTION THEREFOR. IT IS FURTHER AGREED THAT THE LIMITATIONS ON LIABILITY, EXPRESSED HEREIN, SHALL INURE TO THE BENEFIT OF AND APPLY TO ALL PARENT, SUBSIDIARY AND AFFILIATED DMC COMPANIES. IF THE CUSTOMER DESIRES DMC TO ASSUME A GREATER LIABILITY, DMC SHALL AMEND THIS AGREEMENT BY ATTACHING A RIDER SETTING FORTH THE AMOUNT OF ADDITIONAL LIABILITY AND THE ADDITIONAL AMOUNT PAYABLE BY THE CUSTOMER FOR THE ASSUMPTION BY DMC OF SUCH GREATER LIABILITY PROVIDED. HOWEVER, THAT SUCH RIDER AND ADDITIONAL OBLIGATION SHALL IN NO WAY BE INTERPRETED TO HOLD DMC AS AN INSURER. IN THE EVENT ANY PERSON, NOT A PARTY TO THIS AGREEMENT, SHALL MAKE ANY CLAIM OR FILE ANY LAWSUIT AGAINST DMC FOR FAILURE OF ITS EQUIPMENT OR SERVICE IN ANY RESPECT, CUSTOMER AGREES TO INDEMNIFY, DEFEND AND HOLD DMC HARMLESS FROM ANY AND ALL SUCH CLAIMS AND LAWSUITS, INCLUDING THE PAYMENT OF ALL DAMAGES, EXPENSES, COSTS AND ATTORNEYS FEES. IF THIS AGREEMENT PROVIDES FOR A DIRECT CONNECTION TO A MUNICIPAL POLICE OR FIRE DEPARTMENT OR OTHER ORGANIZATION, THAT DEPARTMENT OR OTHER ORGANIZATION MAY INVOKE THE PROVISIONS HEREOF AGAINST ANY CLAIMS BY THE CUSTOMER DUE TO ANY FAILURE OF SUCH DEPARTMENT OR ORGANIZATION.**

This Agreement is not binding unless approved in writing by an authorized [illegible] In the event of failure of such approval, the only liability of DMC shall be to [illegible] the amount, if any, paid to DMC upon signing of this Agreement.

SIGN HERE

By [signature] CD Agent

Approved ______ Authorized Representative of DMC

**CUSTOMER ACCEPTANCE**

In accepting this Proposal, Customer agrees to the terms and conditions contained herein including those on the reverse side and the attached schedule(s) of service and protection. It is understood that they shall prevail over any variation in terms and conditions on any purchase order or other document that the Customer may issue. Any changes in the system requested by the Customer after the execution of this Agreement shall be paid for by the Customer and such changes shall be authorized in writing.

**ATTENTION IS DIRECTED TO THE WARRANTY, LIMIT OF LIABILITY AND OTHER CONDITIONS ON REVERSE SIDE. CLIENTS RIGHT TO CANCEL: RESIDENTIAL CLIENTS MAY CANCEL THIS TRANSACTION ANY TIME PRIOR TO MIDNIGHT THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION BY NOTIFYING DMC AT THE ADDRESS AND PHONE ABOVE.**

Signature [signature]

Title Executive Director Date 11/27/07

DMC FORM 1287 WHITE • DMC COPY YELLOW • CUSTOMER COPY PINK • FILE COPY

**DMC**

**SCHEDULE OF PROTECTION**

**ST. COLETTA'S OF ILLINOIS – MARKHAM**
**FIRE ALARM SYSTEM**
**PAGE 1 OF 2**

**FIRE ALARM SYSTEM TO DMC'S UL CENTRAL STATION VIA DIGITAL COMMUNICATION WITH SUPERVISED BACK UP VIA DMC'S RADIO NETWORK. – SEE SUPPLEMENTAL AGREEMENT**

**NFPA 72/UL LISTED ADDRESSABLE FIRE ALARM CONTROL**

MONITOR WATER FLOW SWITCH-**DEVICE PROVIDED BY OTHERS**

MONITOR GATE VALVE TAMPERS-**DEVICE PROVIDED BY OTHERS**

LOCATE PULL STATION AT WEST FRONT ENTRANCE DOOR

LOCATE PULL STATION WEST PASSAGE DOOR FROM FAMILY ROOM TO GARAGE

LOCATE PULL STATION EAST KITCHEN SLIDING GLASS DOOR

SMOKE DETECTOR WEST 1ST FLOOR LIVING ROOM

SMOKE DETECTOR EAST KITCHEN/DINING ROOM

SMOKE DETECTOR LOWER LEVEL FAMILY ROOM

HEAT DETECTOR IN GARAGE

**2ND FLOOR**

SMOKE DETECTOR 2ND FLOOR HALLWAY AT STAIRS

SMOKE DETECTOR NORTH MASTER BEDROOM

SMOKE DETECTOR NORTH CENTER BEDROOM

SMOKE DETECTOR NORTHWEST CORNER BEDROOM

SMOKE DETECTOR SOUTHWEST CORNER BEDROOM

**BASEMENT**

SMOKE DETECTORS BASEMENTAREA -2 TOTAL

**DMC**

SCHEDULE OF PROTECTION

**ST. COLETTA'S OF ILLINOIS – MARKHAM**
**FIRE ALARM SYSTEM**
**PAGE 2 OF 2**

**AUDIO VISUAL DEVICES**

**1ST FLOOR**

OUTDOOR STROBE IN WHETHER HOUSING AT FRONT ENTRANCE

HORN STROBE WEST FRONT ENTRANCE HALLWAY/LIVING ROOM

HORN STROBE EAST REAR KITCHEN AREA

HORN STROBE WEST FAMILY ROOM PASSAGE DOOR TO GARAGE

STROBE ONLY IN BATHROOM

**2ND FLOOR**

HORN STROBE CENTER BEDROOM HALLWAY

STROBE ONLY IN CENTER HALLWAY BATHROOM

STROBE ONLY IN MASTER BATHROOM

**BASEMENT**

HORN STROBE BASEMENT AREA

**AC POWER ON 20 AMP LOCKDOWN BREAKER PROVIDED BY CUSTOMER'S ELECTRICIAN AS INDICATED BY DMC. SINGLE PHONE LINE PROVIDED BY CUSTOMER AS INDICATED BY DMC.**
**NOTE: SINGLE PHONE LINE ONLY REQUIRED IF DMC RADIO IS UTILIZED AS APPROVED BY LOCAL AHJ MARKHAM**

**ESTIMATE AS GIVEN BASED ON FINAL APPROVAL OF LOCAL AHJ MARKHAM FIRE DEPARTMENT AND ILLINOIS STATE FIRE MARSHAL. ANY ADDITIONAL DEVICES, PERMIT FEES OR PLAN REVIEWS, IF REQUIRED COST TO BE BORNE BY CUSTOMER.**

**EQUIPMENT & INSTALLATION $4890.00 AND $55.00/MONTH MONITORING**

**INSTALL DMC RADIO NETWORK UNIT**
**UNIT TO REMAIN PROPERTY OF DMC**

**RADIO INSTALLATION COST INCLUDED IN MAIN AGREEMENT PLUS $25.00/MONTH**

# D.M.C. SECURITY SERVICES, INC.
## ELECTRONIC PROTECTION DIVISION
## SUPPLEMENTAL AGREEMENT

Customer No.

Date NOVEMBER 21, 2007

THIS AGREEMENT between D.M.C. SECURITY SERVICES, INC. ELECTRONIC PROTECTION DIVISION, hereinafter called "D.M.C." and ST COLETTAS OF ILLINOIS - MARKHAM (Subscriber), supplements the FIRE ALARM SYSTEM Contract between these parties dated NOVEMBER 21, 2007 covering the furnishing of service and equipment to the Subscriber at the Subscriber's premises at 16207 CENTRAL PARK MARKHAM, IL 60428

1. D.M.C. Security will furnish additional service and equipment to the Subscriber at said premises as specified in the Schedule of Protection set forth below.
2. The Subscriber will pay to D.M.C. Security Services, Inc.
   (A) An installation charge of $ installation cost included in main agreement
   (B) An additional service charge of $ 25.00 per MONTH payable in advance.
3. The provisions of the agreement which this supplements shall govern the installation and the rendition of the additional service provided for herein.

## SCHEDULE OF PROTECTION

INSTALL DMC RADIO NETWORK UNIT

UNIT TO REMAIN PROPERTY OF DMC

The aforesaid Contract shall remain in full force and effect in accordance with all the terms and conditions thereof, modified only as specially provided herein, and said Contract as so modified constitutes the entire agreement between the parties, which agreement cannot be further modified constitutes the entire agreement between the parties, which agreement cannot be further modified except by written agreement executed by both parties.

This Supplement is not effective until approved in writing by an Authorized Representative of D.M.C. Security.

SIGN HERE

**D.M.C. SECURITY SERVICES, INC.**
**Electronic Protection Division**

[signature] Sales Representative

CD
Approved ........ Authorized Representative

[signature] Subscriber

Executive Director — Title

11/27/07 — Date

Form 779



SECURITY SERVICES, INC.

Electronic Protection Division

| Salesman's Name | Date | | Sequence No. | Slsmn No. | Terr. No. | Page |
|---|---|---|---|---|---|---|
| C. DONATO | 11-9-07 | 1ST FLOOR | | | | 1 of 2 |

| Customer Name (Site) | Customer No. | Sales Mgr. Approval |
|---|---|---|
| ST COLETTA'S OF ILLINOIS - MARKHAM | | |

| Address | Directions to Site: |
|---|---|
| 16207 CENTRAL PK | |

| City | State | Zip |
|---|---|---|
| MARKHAM | IL | 60428 |

| Installer's Contact | Phone | Control Key Code | Installer's Initials & Date |
|---|---|---|---|
| JERRY GOLK | | | |

Note availability of 24-hr power supply outlets
Presently installed
To be installed by sub

— Show all points of protection — Use pencil — Indicate all dimensions — Show space protection coverage

LEGEND:

C -- Contact
V -- Vibrator
F -- Foil
F/C -- Foil & Contact
P -- Panel (Foil/Lace)
P/C -- Panel & Contact
T -- Trap
S -- Screen

HU -- Hold-Up Button
HU/R -- Hold-Up Rail
P---E -- Photo Electric
B -- Bell
C -- Control
PIR -- Ceiling PIR
PIR -- PIR (Show Dir)
G -- Glass Break
K -- Key Pad

WF WET/6 IN
WF DRY/6 IN
AIR PRESSURE
ROOM TEMP.
FIRE PUMP
JOCKEY PUMP

MANUAL CODED
MANUAL NON-CODED
SMOKE DETECTOR
STAT FIXED TEMP
STAT RATE OF RISE
PERSONNEL DOOR

BOILER SUPERVISION
PIV
OS&Y
BELL
CONTROLS
OVERHEAD DOOR
WINDOW
TANK
INSP. TEST

DMC - 72

SECURITY SERVICES, INC.

Electronic Protection Division

| Salesman's Name | Date | | Sequence No. | Slsmn No. | Terr. No. | Page |
|---|---|---|---|---|---|---|
| C. Dompi? | 11-9-07 | | | | | 2 of 2 |

Customer Name (Site): ST COLETTA'S OF ILLINOIS - MARKHAM

Customer No.:

Sales Mgr. Approval:

Address: 16207 CENTRAL PK

Directions to Site:

City: MARKHAM State: IL Zip: 60426

Installer's Contact: JERRY GALK

Phone:

Control Key Code:

Installer's Initials & Date:

Note availability of 24-hr power supply outlets
Presently installed
To be installed by sub

— Show all points of protection — Use pencil — Indicate all dimensions — Show space protection coverage

LEGEND:

C -- Contact
V -- Vibrator
F -- Foil
F/C -- Foil & Contact
P -- Panel (Foil/Lace)
P/C -- Panel & Contact
T -- Trap
S -- Screen

HU -- Hold-Up Button
HU/R -- Hold-Up Rail
P---E -- Photo Electric
B -- Bell
C -- Control
PIR -- Ceiling PIR
PIR -- PIR (Show Dir)
G -- Glass Break
K -- Key Pad

WF WET/6 IN
WF DRY/6 IN
AIR PRESSURE
ROOM TEMP.
FIRE PUMP
JOCKEY PUMP

MANUAL CODED
MANUAL NON-CODED
SMOKE DETECTOR
STAT FIXED TEMP
STAT RATE OF RISE
PERSONNEL DOOR

BOILER SUPERVISION
PIV
OS&Y
BELL
CONTROLS
OVERHEAD DOOR
WINDOW

TANK
INSP. TEST

DMC - 72

D

4296

ST. COLETTA'S OF ILLINOIS, INC.
18350 CROSSING DRIVE
TINLEY PARK, IL 60477
(708) 342-5200

Palos Bank and Trust
www.palosbank.com

70-2267-719

PAY

TO THE ORDER OF

City of Markham
16313 Kedzie Parkway
Markham, IL. 60428

DATE 01/10/08

AMOUNT $250.00

VOID AFTER 6 MONTHS

⑈004296⑈ ⑆071922670⑆ ⑈46⑈000⑈1⑈

ST. COLETTA'S OF ILLINOIS, INC.

DETACH AND RETAIN THIS STATEMENT
THE ATTACHED CHECK IS IN PAYMENT OF ITEMS DESCRIBED BELOW.
IF NOT CORRECT PLEASE NOTIFY US PROMPTLY. NO RECEIPT DESIRED.
DELUXE BUSINESS FORMS 1-800-328-0304 www.deluxeforms.com
DELUXE - FORM TWCB-3 V-2

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 01/10/08 | Fees<br>674-9000-000 | $250.00 |

V-2

2

# CHAPTER 156: ZONING CODE

Section

***General Provisions***

156.001 Short title

156.002 Interpretation; purpose

156.003 Definitions

***District Boundaries***

156.015 Use districts established

156.016 Location and boundaries of districts

156.017 Annexed land

***Zoning Map; Standards***

156.030 Short title

156.031 Purpose

156.032 Identification of maps and standards adopted by reference

156.033 Official map adopted by reference

156.034 Official standards adopted by reference

156.035 Use of maps and standards in other ordinances

156.036 Comprehensive plan adopted

156.037 Administration and enforcement of subchapter

***R-1 One-Family Residential Districts***

156.050 Application of provisions

156.051 Permitted uses

This chapter shall be known as the zoning regulations of the city.

('77 Code, § 17.03.010)

## § 156.002 INTERPRETATION; PURPOSE.

(A) In its interpretation and application, the provisions of this chapter shall be held to be minimum requirements adopted for the promotion of a comprehensive plan and designed to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to facilitate the adequate provision of transportation, water, sewerage, schools, parks and other public requirements; and to promote the public interest, health, comfort, convenience, safety or general welfare.

(B) It is not intended by this chapter to interfere with or abrogate or annul any ordinance, rules, regulations or permits previously adopted or issued, and not in conflict with any of the provisions of this chapter, or which shall be adopted, or issued, pursuant to law relating to the use of buildings or premises, nor is it intended by this chapter to interfere with or abrogate or annul any easements, covenants or other agreements between parties. However, where this chapter imposes a greater restriction upon the use of buildings or premises or upon height of buildings or requires larger open spaces than are imposed or required by such ordinances, rules, regulations or permits, or by easements, covenants, or agreements that the provisions of this chapter shall control.

('77 Code, § 17.03.020)

## § 156.003 DEFINITIONS.

For the purpose of this chapter, the following definitions shall apply unless the context clearly indicates or requires a different meaning.

***ACCESSORY BUILDING.*** A subordinate building, the use of which is clearly incidental to that of the main building or to the use of the land.

***ADJACENT.*** Nearby, but not necessarily touching.

***ALLEY.*** A public thoroughfare not more than 20 feet wide.

***APARTMENT.*** A suite of rooms, with cooking facilities and private bath and toilet facilities, used for living purposes. Each apartment is considered a dwelling unit.

***APARTMENT HOUSE.*** A building containing apartments.

***AREA OF A SIGN.*** That area in square feet of the smallest geometric figure or combination of regular geometric figures which figure or figures enclose both the copy and facing of the sign.

***AUTOMOBILE SERVICE STATION.*** A place of business having pumps and/or storage tanks from which liquid fuel and/or lubricants are dispensed at retail directly into the motor vehicle. Sales and installation of auto accessories, washing, polishing, inspections and cleaning, but not steam cleaning may be carried on incidental to the sale of such fuel and lubricants.

***BASEMENT.*** A story, partly underground, which has not more than one-half its height measured

from finished floor to finished ceiling above the average grade of the adjoining ground.

***BILLBOARD.*** Any structure or portion thereof upon which a sign or advertisement used as an outdoor display for the purpose of making anything known is displayed. This definition does not include any bulletin boards used to display official court or public office notices.

***BLOCK.*** That property abutting on one side of a street between the two nearest intersecting streets or other natural barriers.

***BOARDINGHOUSE.*** A dwelling in which three, four, or five rooms are occupied as guest rooms and in which food may be served to the occupants thereof. Any dwelling in which more than five rooms are occupied as guest rooms is deemed to be a hotel. A boardinghouse does not include institutions for persons requiring physical or mental care by reason of age, infirmity or disease.

***BUILDING.*** A structure having a roof supported by columns or walls.

***BUILDING AREA.*** The total area, taken on a horizontal plane at the average grade level, of the principal buildings and all accessory buildings, exclusive of uncovered porches, terraces and steps.

***BUILDING HEIGHT.*** The vertical distance measured from the natural grade level to the highest level of the roof surface of flat roofs, to the deck line of mansard roofs, or to the average height between eaves and ridge for gable, gambrel or hip roofs. The building height limitations of these zoning regulations shall not apply to church spires, belfries, cupolas, domes, monuments, water towers, chimneys, flues, vents, flag poles, radio towers, TV towers, public observation towers or airway beacons; nor to any bulkhead, elevator, water tank or similar structure extending above the roof and occupying an aggregate area of not greater than 25% of the horizontal projected roof area.

***BUILDING LINE.*** A building line corresponds to the rear boundary of the front yard.

***BUILDING, MAIN.*** A building in which is conducted the principal use of the lot on which it is situated.

***COMMERCIAL VEHICLE.*** A passenger car, truck, or bus designed and operated for the purpose of monetary gain.

***CONTIGUOUS.*** In contact with.

***COURT.*** Any space other than a yard on the same lot with a building or group of buildings, and which is unobstructed and open to the sky above the floor level of any room having a window or door opening on such court. The width of a court shall be its least horizontal dimension.

***DEPTH OF REAR YARD.*** The average horizontal distance between the rear line of the main building and the centerline of the alley or easement, otherwise the rear lot line.

***DISTRICT.*** A portion of the city within which certain regulations and requirements or various combinations thereof apply under the provisions of these zoning regulations.

***DRIVE-IN RESTAURANT.*** Any establishment where food or beverages are dispensed and where such food or beverages are consumed on the premises but not within a building.

*DWELLING, THEATER.* An open-air theater designed for viewing by the audience from motor vehicles.

*DWELLING, ONE-FAMILY.* Containing one dwelling unit.

*DWELLING UNIT.* A group of rooms or a room occupied or intended for human occupancy.

*ELECTRIC SIGN.* A sign served or energized with electric current for purpose of illumination or for any other purpose.

*FAMILY.* A group of one or more persons occupying a building and living and cooking in a single dwelling unit. No unrelated group living and cooking in a single dwelling unit shall consist of more than six persons, as distinguished from a group occupying a lodginghouse or hotel.

*FRONTAGE.* All property on one side of a street between two intersecting streets or other natural barriers.

*GARAGE, PRIVATE.* An accessory building designed for occupancy by the passenger motor vehicles of the family residing on the same lot. This may include one commercial vehicle under one ton capacity. Noncommercial vehicles of persons not resident on the lot may occupy up to one-half the capacity of such garage.

*GARAGE, PUBLIC.* Any building, other than that as a private garage, as defined above, used for the storage or care of motor vehicles, or where any such vehicles are equipped for operation, repaired, or kept for remuneration, hire or sale.

*GRADE, STREET.* The elevation of the center of a street in front of the center of a building as established by the City Engineer.

*GUEST ROOM.* A room occupied for hire by one or more persons in which no cooking facilities are provided.

*HOME OCCUPATION.* An occupation or a profession conducted for monetary gain which:

(1) Is customarily carried on within a dwelling unit;

(2) Is carried on by a member or members of the family residing in the dwelling unit;

(3) Is clearly incidental and secondary to the use of the dwelling unit for residential purposes;

(4) Conforms to the following additional conditions:

(a) The occupations or profession shall be carried on wholly within the principal building.

(b) No one outside of the family resident on the premises shall be employed in a home occupation.

(c) There shall be no exterior display or storage of materials, and no other exterior indication of the home occupation or variation from the residential character of the principal building.

The maps and standards adopted under §§ 156.033 and 156.034 may be adopted by reference to their titles in other ordinances which regulate the development of the municipality without further filing or publication except where the statutes require otherwise.

('77 Code, § 17.12.060)

### § 156.036 COMPREHENSIVE PLAN ADOPTED.

The "Comprehensive Plan, Markham, Illinois" as prepared by TecSearch, Inc. and approved by the Markham Plan Commission on March 5, 1969, is approved and adopted as the Official Comprehensive Plan for the city.

('77 Code, § 17.12.080)

### § 156.037 ADMINISTRATION AND ENFORCEMENT OF SUBCHAPTER.

Provisions of this chapter, including such maps and standards as are adopted by reference, which also may be incorporated by reference in other regulator ordinances shall be administered and enforced by the officers designated in such regulatory ordinances. Those provisions of this chapter not incorporated in other ordinances shall be enforced by the Mayor.

('77 Code, § 17.12.070)

## R-1 ONE-FAMILY RESIDENTIAL DISTRICTS

### § 156.050 APPLICATION OF PROVISIONS.

The regulations set out in this subchapter shall apply to all R-1 districts, and shall be subject to the provisions of §§ 156.245 through 156.257, 156.270 through 156.278 and 156.290 through 156.294.

('77 Code, § 17.15.010)

### § 156.051 PERMITTED USES.

The following uses are permitted in an R-1 district:

(A) Customary accessory uses and buildings, including private garages, professional offices, and home occupations, provided such uses are incidental to the principal use and do not include the conduct of any retail sales on the premises or wholesale business or manufacturing. An accessory building shall not include servants' quarters, guest rooms or sleeping rooms.

(B) One single-family dwelling on any lot or parcel, which dwelling shall be of such size, bulk, and construction as to contain on the first floor thereof a minimum of 1040 square feet of living floor area if such dwelling is of the single floor design; or 900 square feet of living floor area on the first floor if the dwelling is of the story and one-half or split-level design; or 800 square feet of living floor area on the first floor if the building is of the two-story design.

(C) Temporary offices and/or construction sheds and uses incidental to a construction project on approval of location, size, and necessity, by the Mayor and City Council, but only for the duration of

such project, but not exceeding 12 months. Extension of such time limit may be renewed for six month periods upon a showing of necessity by the petitioner.

(D)    Truck gardening and other horticultural uses where no building is involved; all subject to the applicable health and sanitation regulations of this code and any other applicable ordinances of the city.

('77 Code, § 17.15.020)

## § 156.052  CONDITIONAL USES.

The following may also be permitted upon approval of their location and development by the Plan Commission.

(A)    School, elementary and high (public or private).

(B)    Churches and buildings usually associated with similar activities.

(C)    Publicly-owned and operated parks, playgrounds and other recreation uses, including eating and drinking, sales and service establishments accessory to the use of the above.  However, no such accessory use shall be located closer than 100 feet to any adjacent residential property.

(D)    Governmental and public utility buildings and facilities when necessary for serving the surrounding territory; provided, that no public business offices and no repair or storage facilities are maintained therein.

(E)    Hospitals, clinics and sanitariums.

('77 Code, § 17.15.030)  (Am. Ord. 85-O-1166, passed 3-18-85; Am. Ord. 86-O-1205, passed 1-15-86)

## § 156.053  LOT AREA.

Each lot shall have a minimum width of 80 feet. The minimum lot area per dwelling unit shall be 9,000 square feet. No building with its accessory buildings shall occupy in excess of 30% of the area of an interior lot, nor in excess of 30% of the area of a corner lot.

('77 Code, § 17.15.040)

## § 156.054  YARD SPECIFICATIONS.

(A)    There shall be a front yard having a depth not less than that established by an existing main building on the nearest lot within 100 feet.  However, on a lot between two lots each within 100 feet, which lots have established front yards, then the minimum front yard shall be that established by a line joining the nearest front corner of the main building on one lot and the nearest front corner of the main building on the other lot. Nothing in this section shall require that a front yard be more than 35 feet in depth or to permit a front yard of less than 20 feet in depth. On a lot that is not within 100 feet of a lot with an established front yard, the front yard shall be not less than 25 feet.

(B)    There shall be a rear yard of not less than 10% of the depth of the lot. However, such rear yard shall be a minimum of ten feet in depth.

(C) Two side yards shall be provided for each lot. The combined width of the two side yards shall be not less than 25% of the lot width, with a minimum width of eight feet for either side yard.

('77 Code, § 17.15.050)

### § 156.055 CORNER LOT.

Front yard requirements shall be complied with along both streets abutting corner lots except that the depth of the yard abutting the side street need not exceed 20 feet.

('77 Code, § 17.15.060)

### § 156.056 BUILDING HEIGHT LIMITATION.

No building shall be erected or altered to exceed 30 feet in height.

('77 Code, § 17.15.070)

## R-2 ONE-FAMILY RESIDENTIAL DISTRICTS

### § 156.065 APPLICATION OF PROVISIONS.

The following regulations set out in this subchapter shall apply to all R-2 districts, and shall be subject to the provisions of §§ 156.245 through 156.257, 156.270 through 156.278 and 156.290 through 156.294.

('77 Code, § 17.18.010)

### § 156.066 PERMITTED USES.

The following uses are permitted in an R-2 district:

(A) One single-family dwelling on any lot or parcel which dwelling shall be of such size, bulk, and construction as to contain on the first floor thereof a minimum of 1,040 square feet of living floor area if such dwelling is of the single-floor design; or 810 square feet of living floor area on the first floor if the dwelling is of the story and one-half or split-level design; or 720 square feet of living floor area on the first floor if the dwelling is of the two-story design.

(B) All uses permitted in the R-1 district.

('77 Code, § 17.18.020)

### § 156.067 LOT AREA.

Each lot shall have a minimum lot width of 70 feet. The minimum lot area per dwelling unit shall be 8,000 square feet. No building with its accessory buildings shall occupy in excess of 30% of the area of an interior lot, nor in excess of 30% of the area of a corner lot.

('77 Code, § 17.18.030)

## § 156.068 YARD SPECIFICATIONS.

The yard requirements specified in the R-1 residence districts shall be the requirements for the R-2 residence districts as if the same were set forth in this subchapter except that the side yard requirements shall be as follows: Two side yards shall be provided for each lot. The combined width of the two side yards shall be not less than 25% of the lot width, with a minimum width of seven feet for either side yard.

('77 Code, § 17.18.040)

## § 156.069 CORNER LOT.

The corner lot requirements specified in the R-1 residence district shall be the requirements for the R-2 residence district as if the same were set forth in this subchapter.

('77 Code, § 17.18.050)

## § 156.070 BUILDING HEIGHT LIMITATION.

No building shall be erected or altered to exceed 30 feet in height.

('77 Code, § 17.18.060)

# R-3 ONE-FAMILY RESIDENTIAL DISTRICTS

## § 156.080 APPLICATION OF PROVISIONS.

The following regulations shall apply to all R-3 districts, and shall be subject to the provisions of §§ 156.245 through 156.257, 156.270 through 156.278 and 156.290 through 156.294.

('77 Code, § 17.21.010)

## § 156.081 PERMITTED USES.

The following uses are permitted in a R-3 district:

(A) One single-family dwelling on any lot or parcel, which dwelling shall be of such size, bulk and construction as to contain on the first floor thereof a minimum of 960 square feet of living floor area if such dwelling is of the single-floor design; or 720 square feet of living floor area on the first floor if the dwelling is of the story and one-half, split-level, or two-story design;

(B) All uses permitted in the R-2 district.

('77 Code, § 17.21.020)

## § 156.082 LOT AREA.

Each lot shall have a minimum lot width of 60 feet. The minimum area per dwelling unit shall be 7,200 square feet. No building with its accessory buildings shall occupy in excess of 30% of the area of an interior lot, nor in excess of 30% of a corner lot.

('77 Code, § 17.21.030)

### § 156.083  YARD SPECIFICATIONS.

The yard requirements specified in the R-1 residence districts shall be the requirements for the R-3 residence districts as if the same were set forth under this subchapter except that the side yard requirements shall be as follows: Two side yards shall be provided for each lot. The combined width of the two side yards shall be not less than 25% of the lot width, with a minimum width of six feet for either side yard.

('77 Code, § 17.21.040)

### § 156.084  CORNER LOT.

The corner lot requirements specified in the R-1 residence district shall be the requirements for the R-3 residence district as if the same were set forth under this subchapter.

('77 Code, § 17.21.050)

### § 156.085  BUILDING HEIGHT LIMITATION.

No building shall be erected or altered to exceed 30 feet in height.

('77 Code, § 17.21.060)

## R-3A ONE-FAMILY RESIDENTIAL DISTRICT

### § 156.095  APPLICATION OF PROVISIONS.

The following sections shall apply to all R-3A one-family use districts and shall be subject to the provisions of §§ 156.245 through 156.257, 156.270 through 156.278 and 156.290 through 156.294.

('77 Code, § 17.24.010)  (Ord. 547, passed - -64)

### § 156.096  PERMITTED USES.

The following are permitted in an R-3A district:

(A)   One single-family dwelling on any lot or parcel, which dwelling shall be of such size, bulk, and construction as to contain on the first floor thereof a minimum of 1,050 square feet of living floor area if such dwelling is of the single-floor design; or 720 square feet of living area on the first floor if the dwelling is of the story and one-half, split-level, or two-story design.

(B)   All uses permitted in the R-3 district.

('77 Code, § 17.24.020) (Ord. 547, passed - -64)

### § 156.097 LOT AREA.

Each lot shall have a minimum width of 57 feet. The minimum lot area per dwelling unit shall be 6,600 square feet. No building with its accessory buildings shall occupy in excess of 30% of the area of an interior lot, nor in excess of 30% of a corner lot.

('77 Code, § 17.24.030) (Ord. 547, passed - -64)

### § 156.098 YARD SPECIFICATIONS.

The yard requirements specified are: There shall be a rear yard of not less than ten feet in depth. Two side yards shall be provided for each lot. The total width of the yards shall not be less than ten feet with a minimum of five feet for either side yard. There shall be provided a public utility easement of not less than six feet as measured from the rear lot line, and no buildings shall be erected closer than ten feet from the rear lot line.

('77 Code, § 17.24.040) (Ord. 547, passed - -64)

### § 156.099 CORNER LOT.

The corner lot requirements specified in the R-1 residence district shall apply to R-3A districts as if the same were set forth in this subchapter.

('77 Code, § 17.24.050) (Ord. 547, passed - -64)

### § 156.100 BUILDING HEIGHT LIMITATION.

No building shall be erected or altered to exceed 30 feet in height.

('77 Code, § 17.24.060) (Ord. 547, passed - -64)

## R-3B ONE-FAMILY TOWN HOME RESIDENTIAL DISTRICT

### § 156.105 DISTRICT REGULATIONS.

There is hereby established residential housing district R-3B, One-Family Town Home Residential District, with the following requirements:

(A) That such homes as are proposed shall have a minimum of 12,000 square feet of living space;

(B) That the lot size be a minimum of 524 feet wide with a depth of 105 feet;

(C) That the setback on the west should be 25 feet from the lot line on Kedzie Avenue, on the east side the setback should be ten feet from the lot line and on the north and south the setback should be 25 feet from the lot line;

(D) The building height shall not exceed 30 feet;

(E) There should be a minimum of two parking spaces per unit and one parking space per unit for guests.

(F) The 20-foot alley to the east of the lot should be vacated by the city from 157th Street to 158th Street, with the developer and such successor owners' association as may be created responsible for black-topping and maintenance of the former alley, the installation and maintenance of sewers therein, in perpetuity, granting to the city a perpetual easement for maintenance of such city facilities as may be underground therein and for payment to the city of sewer fees for each living unit;

(G) The developer shall install a minimum of a six-inch water line from the west side of Kedzie Avenue to the nearest location on the east side of Kedzie Avenue, in accordance with state and county rules and regulations regarding work on, under, above and upon Kedzie Avenue; and

(H) The developer must improve 158th Street with black-topping as a part of the project.

(Ord. 04-O-1808, passed 8-4-04)

# R-4 ONE-FAMILY RESIDENTIAL DISTRICT

### § 156.110 APPLICATION OF PROVISIONS.

The following regulations of this subchapter shall apply to all R-4 districts, and shall be subject to the provisions of §§ 156.245 through 156.257, 156.270 through 156.278 and 156.290 through 156.294.

('77 Code, § 17.27.010)

### § 156.111 PERMITTED USES.

The following uses are permitted in an R-4 district:

(A) One single-family dwelling on any lot or parcel, which dwelling shall be of such size, bulk, and construction as to contain on the first floor thereof a minimum of 960 square feet of living floor area if such dwelling is of the single-floor design; or 720 square feet of living floor area on the first floor if the dwelling is of the story and one-half, split-level, or two-story design.

(B) All uses permitted in the R-3 district.

('77 Code, § 17.27.020)

### § 156.112 LOT AREA.

Each lot shall have a minimum lot width of 45 feet. The minimum lot area per dwelling unit shall be 5,400 square feet. No building with its accessory buildings shall occupy in excess of 35% of the area of any interior lot, nor in excess of 35% of a corner lot.

('77 Code, § 17.27.030)

# CHAPTER 110: GENERAL BUSINESS LICENSING

Section

***General Provisions***

110.01 Short title

110.02 Purpose; jurisdiction

110.03 Definitions

110.04 Nuisances

***Licensing Provisions***

110.15 Scope of activity requiring license

110.16 Qualifications of applicants

110.17 Applications; forms; signatures

110.18 Issuance of receipts

110.19 Investigations

110.20 Approval of licenses

110.21 Procedure when license not approved

110.22 Renewal of license

110.23 Duplicate license; fee

110.24 License fee; established; duration; proration; refund

110.25 License fee schedule

110.26 Contents of license

110.27 Display of license and insignia

110.28 Change of location

110.29 Records and books to be kept

110.30 Transference of license

110.31 Duties of licensee

110.32 Termination of licenses

110.33 Revocation of licenses

110.34 Vehicle tag

*Administration and Enforcement*

110.40 Authority to enforce regulations

110.41 Investigations and inspections

110.42 Right of entry for inspection; reports

110.43 Provisional order; final order

110.44 Summary action

110.45 Appeal procedure

110.46 Liability of violator

110.99 Penalty

# GENERAL PROVISIONS

## § 110.01 SHORT TITLE.

This chapter shall be known and may be cited as the General Licensing Ordinance of the city.

('77 Code, § 5.02.010) (Ord. 67-O-673, passed - -67)

## § 110.02 PURPOSE; JURISDICTION.

(A) The express purpose of this chapter is to protect and safeguard the health, safety and welfare of the citizens of the city; to increase public confidence in legitimate commerce; to further ensure adequate and periodic provisions of essential governmental inspectional services; and to provide for an accurate record of regulated commercial activities within the city,

(B) It is not intended by this chapter to repeal, abrogate, annul or in any way impair or interfere with existing provisions of other laws or ordinances, except those specifically repealed by the ordinance

codified in this chapter. Where this chapter imposes a greater restriction upon persons, premises or personal property than is imposed or required by such existing provisions of law, ordinance, contract or deed, the provisions of this chapter shall control.

('77 Code, § 5.02.020) (Ord. 67-O-673, passed - -67)

## § 110.03 DEFINITIONS.

For the purpose of this chapter, the following definitions shall apply unless the context clearly indicates or requires a different meaning.

***ACCESSORY ACTIVITY.*** An activity or use which is customarily incidental and/or subordinate to a principal activity. However, such an activity, if conducted separately and independently of the principal activity, would be subject to licensing under the provisions of this chapter and is included in the ownership of the establishment.

***BUSINESS.*** Includes all kinds of vocations, occupations, professions, enterprises, establishments and all other kinds of activities and matters, together with all devices, machines, vehicles or appurtenances used therein, any of which are conducted for private profit, or benefit, either directly or indirectly, on any premises in the city, or anywhere else within its jurisdiction.

***CITY LICENSE COMMISSION*** or ***LICENSE COMMISSION.*** The License Commission of the city.

***INSIGNIA*** or its singular number ***INSIGNE.*** Any tag, plate, badge, emblem, sticker or any other kind of device which may be required for any use in connection with any license.

***LICENSE*** or ***LICENSEE.*** Includes respectively the words ***PERMIT*** or ***PERMITTEE*** or the holder for any use or period of time of any similar privilege.

***OWNER.*** Any individual, firm, association, partnership, corporation, trust or any other legal entity having sufficient proprietary interest in a commercial activity or establishment to maintain and manage it operations.

***PERSON.*** Includes individual natural persons, partnerships, joint adventures, societies, associations, clubs, trustees, trusts or corporations; or any officers, agents, employees, factors or any kind of personal representatives of any thereof, in any capacity, acting either for himself, or for any other person, under either personal appointment or pursuant to law.

***PREMISES.*** Includes all lands, structures, places and also the equipment and appurtenances connected or used therewith in any business, and also any personal property which is either affixed to, or is otherwise used in connection with, any such business conducted on such premises.

***PRINCIPAL ACTIVITY.*** The activity or use which utilizes the major portion of gross floor and/or land area.

***USABLE AREA.*** The sum total of the gross horizontal area of all of the several floors of a building measured in square feet from the exterior walls or from the centerline of party walls separating two buildings.

(1) Usable area includes attic, balcony, mezzanine, basement, cellar and/or porch areas devoted in storage, equipment installation or accessory uses.

(2) Open area directly essential to the sale, service or production activity of any establishment shall be included in the computation of gross usable area. However, open area devoted to vehicular customer parking or the handling of materials shall not be included.

(3) The usable area of a principal activity may be deducted from the gross area in the computation of usable area of any accessory activity.

('77 Code, § 5.02.030) (Ord. 67-O-673, passed - -67)

### § 110.04 NUISANCES.

No business, licensed or not shall be so conducted or operated as to amount to a nuisance in fact.

(Ord. 92-O-1432, passed 3-18-92) Penalty, see § 110.99

## LICENSING PROVISIONS

### § 110.15 SCOPE OF ACTIVITY REQUIRING LICENSE.

(A) It is unlawful for any person, either directly or indirectly, to conduct any business or nonprofit enterprise, or to use in connection therewith any vehicle, premises, machine or device, in whole or in part, for which a license or permit is required by this chapter or other law or ordinance of the city,

without a license or permit therefor being first procured and kept in effect at all times as required by this chapter or other law or ordinance of the city.

(B) This chapter shall apply to all business in the nature of special sales for which a license is required by this chapter or other law or ordinance of the city and it is unlawful for any person, either directly or indirectly, to conduct any such sale except in conformity with the provisions of this chapter.

(1) For the purpose of this chapter, any person is deemed to be in business or engaging in nonprofit enterprise, and thus subject to the requirements of this section and division (A), when he does one act of the following:

(a) Selling any goods or service;

(b) Soliciting business or offering goods or services for sale or hire;

(c) Acquiring or using any vehicle or any premises in the city for business purposes;

(d) Holds himself forth as being engaged in a business or an occupation;

(e) Solicits patronage, actively or passively, for a business or occupation; ~~or~~

(f) Performs or attempts to perform any part of a business or occupation in the city; or

(g)    The holding of a garage or yard sale of used personal property.

(2)    The agents or other representatives of nonresidents who are doing business in the city shall be personally responsible for the compliance of their principals and of the businesses they represent with this chapter.

(3)    (a)    A license shall be obtained in the manner prescribed in this chapter for each branch establishment or location of the business engaged in, as if each such branch establishment or location were a separate business.

(b)    Each rental real property is deemed a branch establishment or separate place of business for the purposes of this chapter when there is a representative of the owner or the owner's agent on the premises who is authorized to transact business for such owner or owner's agent or there is a regular employee of the owner or the owner's agent working on the premises.

(4)    A person, engaged in two or more businesses at the same location shall not be required to obtain separate licenses for conducting each of such businesses but, when eligible, shall be issued one license which shall specify on its face all such businesses.

('77 Code, § 5.02.040)  (Ord. 67-O-673, passed - -67)

(C)    Whenever in this code a license is required for the maintenance, operation or conduct of any business or establishment, or for doing business or engaging in any activity or occupation, any person or corporation shall be subject to the requirement if by himself or through an agent, employee, or partner, he holds himself forth as being engaged in the business or occupation; or solicits patronage therefor, activity or passively; or performs or attempts to perform any part of such business or occupation in the city.

(Ord. 92-O-1432, passed 3-18-92; Am. Ord. 97-O-1615, passed 9-3-97) Penalty, see § 110.99

## § 110.16  QUALIFICATIONS OF APPLICANTS.

The general standards set out in this section relative to the qualifications of every applicant for a city license shall be considered and applied by the City License Commission.  The applicant shall comply with the following:

(A)    Be a citizen of the United States, or a declarant therefor as authorized by law.

(B)    Not, either individually, or as a member of any party, group, or organization, at the time of any such application for a license or special permit, advocate or resort to any practices subversive of or designed for the overthrow, destruction or sabotage of the government of the United States.

(C)    Not be in default under the provisions of this chapter or indebted or obligated in any manner to the city except for current taxes;

(D)    No license or permit shall be issued for the conduct of any business or performance of any act which would involve a violation of the zoning code of the city. No license shall be issued for the conduct of any business, and no permit shall be issued for any thing, or act, if the premises and building to be used for the purpose do not fully comply with the requirements of the city.

('77 Code, § 5.02.050)  (Ord. 67-O-673, passed - -67)

(E)   No license shall be issued for the conduct of any business and no permit shall be issued for any thing or act, if the premises and building to be used for the purpose do not fully comply with the requirements of the city. No such license or permit shall be issued for the conduct of any business or performance of any act which would involve a violation of the zoning ordinances of the city. (Ord. 92-O-1432, passed 3-18-92)

## § 110.17  APPLICATIONS; FORMS; SIGNATURES.

(A)   (1)   Applications for all licenses and permits required by ordinance shall be made in writing to the City Clerk, on forms provided by that office, in the absence of provisions to the contrary. Each application shall state the name of the applicant, the permit or license desired, the location to be used, if any, the time covered and the fee to be paid; and each application shall contain such additional information as may be needed for the proper guidance of the city officials in the issuing of the permit or license applied for.

(2)   Applications for the conduct of a garage or yard sale shall be limited to bona fide residents of the City of Markham who have resided within the city for a minimum of one year at the location for which the license is sought.

(B)   There shall be a nonrefundable license application fee of $15 paid at the time of submission of the application for license with credit to be given on the license fee due upon approval of the application. There shall be a fee of $20 for each returned check, whether NSF or otherwise; failure to pay said charges immediately upon notification shall result in an administrative revocation of the license or denial of the application.

(C)   Forms for all licenses and permits, and applications therefor, shall be prepared and kept on file by the City Clerk.

(D)   Each license or permit issued shall bear the signatures of the Mayor and the City Clerk in the absence of any provision to the contrary.

(Ord. 92-O-1432, passed 3-18-92; Am. Ord. 97-O-1615, passed 9-3-97)

## § 110.18  ISSUANCE OF RECEIPTS.

At the time the application for a license is made, the City Clerk shall issue a receipt to the applicant for the money paid in advance. Such receipt shall not be construed as the approval for the issuance of a license nor shall it entitle or authorize the applicant to open or maintain any business contrary to the provisions of this chapter.

(B)   Upon the receipt of an application for a license or a permit, the Clerk shall within 48 hours of the time of such receipt refer such application to the Mayor for processing by the City License Commission.

(C)   A license for the conduct of a garage or yard sale may be summarily approved and issued by the City Clerk.

('77 Code, § 5.02.070)  (Ord. 67-O-673, passed - -67; Am. Ord. 97-O-1615, passed 9-3-97)

## § 110.19 INVESTIGATIONS.

(A)    Upon the receipt of an application for a license or permit where ordinances of the city necessitate an inspection or investigation before the issuance of such permit or license, the City Clerk shall refer such application to the proper officer for making such investigation within 48 hours of the time of such receipt. The officer charged with the duty of making the investigation or inspection shall make a report thereon, favorable or otherwise, within ten days after receiving the application or a copy thereof. The Health Officer shall make or cause to be made an inspection in regard to such licenses in the connection of the care and handling of food and the preventing of nuisances and the spread of disease, for the protection of health; the Building Inspector shall make or cause to be made any such inspections relative to the construction of buildings or other structures. All other investigations except where otherwise provided, shall be made by the Chief of Police or by some other officer designated by the Mayor.

(B)    There shall be no investigation of the application for a garage or yard sale license except for the ascertaining by the City Clerk that the applicant has been a bona fide resident of the City of Markham at the stated location for the required period.

(Ord. 92-O-1432, passed 3-18-92; Am. Ord. 97-O-1615, passed 9-3-97)

## § 110.20 APPROVAL OF LICENSES.

(A)    The Mayor shall present all applications for license together with the recommendation of the City License Commission to the City Council. All licenses and permits authorized or required by this chapter or other ordinances of the city shall be granted by the Council which shall have the power to grant applications and to pass upon the sufficiency of any bond, where a bond is required.

(B)    Every license, when application therefor has been approved by the Council, shall be issued by the City Clerk, provided the prescribed fee is first paid and, where a bond is required, that the bond is properly approved and filed.

('77 Code, § 5.02.090)  (Ord. 67-O-673, passed - -67)

## § 110.21 PROCEDURE WHEN LICENSE NOT APPROVED.

(A)    In the event the City Council refuses to grant an application for a license, or if the applicant does not pick up the license, the $10 service fee will be nonrefundable.

(B)    The City License Commission shall send written notification to the applicant of the refusal to grant the license.

(C)    Upon written request from the applicant received within ten days of notification of refusal to grant the license, the City License Commission shall schedule a hearing to receive additional information relative to determining the eligibility of the applicant for the business license requested.

(D)    When the issuance of a license is denied and any action is instituted by the applicant to compel its issuance, such applicant shall not engage in the business for which the license was refused unless a license be issued to him pursuant to a judgment ordering the same.

('77 Code, § 5.02.100)  (Ord. 67-O-673, passed - -67; Am. Ord. 87-O-1271, passed 5-6-87)