UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ST. COLETTA'S OF ILLINOIS, INC., an Illinois not-for-profit corporation, and JESSE McMORRIS, an individual, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 08 C 0409 |
| v. | ) ) | Senior District Judge Milton I. Shadur |
| CITY OF MARKHAM, an Illinois municipal corporation, DAVID WEBB, JR., J.V. COOK, SR., THADDEUS GOODLOW and ROGER AGPAWA, individuals, | ) ) ) ) ) ) ) ) | Magistrate Judge Susan E. Cox |
| Defendants. | ) ) | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs St. Coletta's of Illinois, Inc. ("St. Coletta's") and Jesse McMorris ("Mr. McMorris") (collectively "Plaintiffs") by counsel Nicholas Anaclerio and Jamie A. Robinson of Ungaretti & Harris, LLP, submit this memorandum of law in support of their Petition for a Temporary Restraining Order and Preliminary Injunction against the City of Markham (the "City" or "Markham"), and David Webb, Jr. ("Mr. Webb"), J.V. Cook, Sr., ("Mr. Cook"), Thaddeus Goodlow ("Mr. Goodlow") and Roger Agpawa ("Mr. Agpawa"), (collectively the "Defendants").

## EVIDENCE COMPELLING ISSUANCE OF INJUNCTIVE RELIEF

Plaintiffs seek to enjoin Defendants' ongoing, unlawful and discriminatory efforts to prevent St. Coletta's from opening and operating a residential "group home" for developmentally disabled people in the City of Markham at 16207 S. Central Park (the "Home"). By stalling

Plaintiffs, by denying them requested municipal permits to which they have been entitled, by giving them inconsistent direction and offering inaccurate, unsupported interpretations of its ordinances, Defendants have unlawfully blocked St. Coletta's from preparing and opening the Home, creating the real possibility that they will be homeless on February 1, 2008.

St. Coletta's is an Illinois not-for-profit corporation, which provides a variety of services to developmentally disabled adults and children, including the operation of a number of assisted-living residential group homes.[1] St. Coletta's purchased the Home on or about November 3, 2007 for the purpose of outfitting and opening it as a group home for six developmentally disabled individuals (the "Residents"), including Mr. McMorris. The Residents are set to move in on February 1, 2008. Mr. McMorris currently lives with 3 other developmentally disabled persons (all of whom are also Residents) in an apartment rented by St. Coletta's and located in Tinley Park, Illinois. The lease on the apartment expires on January 31, 2008.[2]

On November 21, 2007, after St. Coletta's informed the City that it intended to use the Home as a group home, it applied to the City for fire alarm and sprinkler system installation permits. Markham's Residential Building Inspector, Mr. Goodlow and its Deputy Fire Chief, Mr. Agpawa, responded that they would not issue the permits unless St. Coletta's applied for and obtained a business license and petitioned the City for approval of the use of the Home as a group home.[3] Although St. Coletta's disagreed with the City, it attempted to comply with Mr. Goodlow's instructions in order to protect the Residents and facilitate the Home's opening by the end of January.

St. Coletta's notified the City Clerk that it needed a prompt hearing on its petition and application because of the January 31, 2008 deadline. Upon information provided by the City

---

[1] Ex. A, Affidavit of R. Bryan, ¶2.
[2] Ex. B, Supplemental Affidavit of R. Bryan, ¶¶ 5-6, 10-13.
[3] Ex. B, ¶¶15-16.

Clerk, on November 30, 2007, St. Coletta's paid a $500 fee for an expedited special Planning

Commision meeting with its applications. St. Coletta's received no response.[4]

On or about December 11, 2007, St. Coletta's inquired with the City about the status of

its petition and application and was directed to speak to the City Clerk. The City Clerk claimed

she had no authority to schedule a Planning Commission meeting and that St. Coletta's would

have to meet with Mr. Goodlow.[5]   When St. Coletta's met with Mr. Goodlow, he explained that

the City had a problem with group homes because they allowed "rapists and criminals" into the

City.   Mr. Goodlow claimed that St. Coletta's request for the Plan Commission's expedited

review had been "misplaced," and that St. Coletta's would be on the agenda for the next regular

meeting, scheduled for January 9, 2008, notwithstanding its payment of an expedited fee.[6]

St. Coletta's expressed to Mr. Goodlow its concern about the delay in proceedings based

on the January 31, 2008 deadline.  Mr. Goodlow told St. Coletta's to meet with the Mayor for

further direction.  The Mayor's secretary, however, refused to let St. Coletta's representatives see

him, and referred them back to Mr. Goodlow.[7]

On December 27, 2007, the City Council's attorney, Steven R. Miller, informed St.

Coletta's that, contrary to Mr. Goodlow's statement, St. Coletta's did not need to obtain

permission to use the property as a group home, but did need a business license.[8]   According to

Mr. Miller, the Planning Commission needed to endorse the business license application as a

condition to getting on the City Council's agenda to approval the license.[9]

---

[4] Ex. B, ¶¶ 17-20.
[5] Ex. B, ¶¶ 20-21.
[6] Ex. B, ¶¶22-23.
[7] Ex. B, ¶¶27-29.
[8] Ex. C, Affidavit of W. Kottmeyer, ¶¶17-19.
[9] Ex. B, ¶19.

St. Coletta's representatives then appeared before the Planning Commission on January 9, 2008.[10] During this meeting, various members of the public spoke generally against group homes, asserting that they attracted criminals, drug users and other "undesirables." The Planning Commission retained a consultant who prepared a written report recommending the rejection of the petition because the Home's use as a residential group home was a non-conforming use for which zoning approval is required. The report was not provided to St. Coletta's.[11]

During the hearing, St. Coletta's stated that it did not agree that it needed to obtain a special use permit or a business license to open the Home. Nevertheless, in the interest of protecting its Residents, St. Coletta's requested that the Commission 1) approve the use; 2) recommend the approval of the business license so St. Coletta's could be placed on the January 16 City Council meeting agenda; and 3) instruct the City staff to issue the fire alarm and sprinkler system permits to St. Coletta's.[12]

The Planning Commission's newly-appointed attorney, Ms. Broughton-Fountain, suggested that it needed more time to consider the conclusions of its consultant and more time to issue her legal opinion. Consequently, the Planning Commission made no recommendation to the City Council and refused to authorize the addition of St. Coletta's pleas to the City Council's January 16, 2008 meeting agenda.[13] St. Coletta's petition was purportedly tabled until the next regularly scheduled Planning Commission meeting, thereby eliminating any possibility that a business license, zoning approval, sprinkler or alarm installation permits would be issued in time for St. Coletta's and the Residents to meet their January 31 move deadline.[14]

---

[10] Ex. C, ¶22.
[11] Ex. C, ¶¶ 22, 24.
[12] Ex. C, ¶25.
[13] Ex. C, ¶¶30-31.
[14] Ex. C, ¶32.

The Plaintiffs filed their complaint against the Defendants on Friday, January 18, 2008. That very same day, the City sent notice by regular mail to St. Coletta's that a "special Planning Committee" was scheduled for Thursday, January 24, 2008.[15] St. Coletta's attended the meeting thought the City never informed it of what the hearing was for or what the City's position would be. At, the hearing, the City's position was that St. Coletta's needed a business license to operate the Home.[16] St. Coletta's maintained that the Planning Commission lacked jurisdiction to issue a business licenses under its own Code and that St. Coletta's is not a business as defined by the Code.[17] Nevertheless, the Planning Commission proceeded. Similar to the prior Planning Commission meeting, several individuals from the community expressed that they did not want this Home in their neighborhood based on their fears that the Residents might harm their children.[18] Despite the public outcry, the Planning Commission recommended that the business license be approved, although three of the five Planning Commission members abstained from voting. That recommendation, however, will not be acted on until at least February 6, 2008 when the City Council meets.[19]

The Defendants' conduct reflects an intentional, systematic plan to exclude St. Coletta's and the Residents from Markham by ensuring that the Home could not be habitable by the January 31, 2008 deadline, of which the City was very well aware. The City's hostility was further evinced when it went so far as to turn off the water to the Home without notice in the middle of a Chicago winter, though there was no delinquency in water bill payments.[20] Without

---

[15] Ex. D, letter of notice.
[16] Ex. E, 1/24/08 transcript of proceedings, pp. 7-8, 57.
[17] Ex. E, pp. 11-12.
[18] Ex. E, pp. 43-56.
[19] Ex. E, pp. 83-84.
[20] Affidavit of Jerry Golk, Ex. H, ¶¶ 9-11.

any doubt, Court intervention is necessary to put an end to the Defendants' abuse of their municipal and official authority, and their illegal, discriminatory and reprehensible misconduct.

## **ARGUMENT**

Plaintiffs' motion for a temporary restraining order and preliminary injunction should be granted. Injunctive relief should be granted where a movant shows: (a) a likelihood of success on the merits of its claims, (b) that it will be irreparably harmed absent entry of an injunction, (c) it lacks an adequate remedy at law, (d) that the harm to the plaintiff without an injunction outweighs the harm to the defendant from an injunction, and (e) that the injunction will not harm the public interest. *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*, 420 F. Supp. 2d 866, 872 (N.D. Ill. 2006). "This balancing involves a sliding scale analysis: the greater [plaintiff's] chances of success on the merits, the less strong a showing it must make that the balance of harm is in its favor." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003). Here, each relevant factor strongly supports the entry of a TRO and preliminary injunction.

### A.    **Plaintiffs are Likely to Succeed on the Merits.**

Plaintiffs were undoubtedly entitled to sprinkler and fire alarm permits in November and the permits were not contingent on zoning or license approval. Neither a business license nor zoning approval is necessary to operate the Home as a group home under the City's Code. The Defendants' purported "reasons" for blocking St. Coletta's are utterly without legal justification and transparent pretexts for illegal discrimination.

### 1.    **The Plaintiffs Will Be Able to Establish Violations of the Fair Housing Act ("FHA"), the Americans With Disabilities Act ("ADA"), and Violations of Equal Protection.**

"A plaintiff may show discrimination which would be a violation of the FHA or ADA in three ways to wit: (1) intentional discrimination; (2) discriminatory impact; and (3) a refusal to

make a reasonable accommodation." *New Hope Fellowship, Inc. v. City of Omaha, Nebraska*, 2005 WL 3508407 (D. Neb.). The Plaintiffs will be able to show that Defendants' actions evinced an intent to discriminate and a refusal to make a reasonable accommodation.

The FHA makes it unlawful for anyone "to discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of . . . a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available." 42 U.S.C. § 3604(f)(1)(B). The FHA also makes it unlawful to "interfere with any person in the exercise or enjoyment of . . . any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617. The ADA makes it unlawful for a public entity to discriminate against an individual with a disability. 42 U.S.C. § 12132. Housing discrimination claims made pursuant to the FHA, ADA and equal protection are analyzed under the same rubric. *Dr. Gertrude A. Barber Center, Inc. v. Peters Township*, 273 F.Sup.2d 643, 652 (W.D. Penn. 2003).

The FHA and ADA similarly define "handicap" or "disability" as a physical or mental impairment which substantially limits one or more of such person's major life activities. 42 U.S.C. § 3602(h)(1), 42 U.S.C. § 12102(2)(A). Mr. McMorris and the other Residents' are disabled or handicapped as those terms are defined by the FHA and ADA because they have mental impairments that substantially limit their major life activities – limitations that group home living is intended to ameliorate. *Dr. Gertrude A. Barber Center*, 273 F.Sup.2d 643 at 646. (finding mentally retarded individuals disabled for purposes of the FHA and ADA where the individuals were "unlikely, due to the nature of their disabilities, to participate in competitive employment, marry, establish their own families, or purchase their own home").

> a. The Evidence Demonstrates that the City Intentionally Discriminated Against the Plaintiffs.

The Defendants' intentionally discriminated against the Plaintiffs.

> Factors to be considered in evaluating a claim of intentional discrimination under the FHA or ADA include: (1) the discriminatory impact of the governmental decision; (2) the decision's historical background; (3) the specific sequence of events leading up to the challenged decision; (4) departures from the normal procedural sequences; (5) departures from normal substantive criteria; and (6) legislative or administrative history, especially contemporary statement by member of the decision-making body. *New Hope Fellowship*, 2005 WL 3508407, * 6.

The discriminatory bias motivating the Defendants' dilatory behavior is evident from the statements made by City officials. Mr. Goodlow – the man who refused to issue the building permits – told St. Coletta's that the City had "problems" with group homes because they attracted "rapists" and "criminals."[21] These sentiments were echoed by members of the public who attended the two sham Planning Commission hearings.[22] Mr. Goodlow further stated that he would have never issued an occupancy permit for the Property had he known the Property was being used for a group home.[23] This same type of evidence of "neighborhood animus toward handicapped individuals" is sufficient to support a finding of reasonable likelihood of success under the FHA. *North Shore-Chicago Rehabilitation Inc. v. Village of Skokie*, 827 F. Supp. 497, 507-08 (N.D. Ill. 1993).

The invidious discrimination by the City is also readily apparent by the City's departures from normal procedure and in fabricating "requirements" that St. Coletta's must meet to open the Home. In November of 2007, St. Coletta's submitted all required documentation and followed all of the City's instructions related to the issuance of permits for the installation of a sprinkler

---

[21] Ex. B, ¶23.

[22] Ex. C, ¶28.

[23] Ex. C, ¶26.

system and fire alarm system[24] - systems required by state law.   The Defendants never

challenged the sufficiency of the applications or the underlying system specifications. Yet, by

January 2008, the City had still not acted on the applications and claimed that it could not issue

the permits until St. Coletta's received a business license and zoning approval[25] - requirements

conspicuously absent from the City's Code.

On January 22, 2008, this Court entered an Order of Mandamus directing the City to

issue the permits.  Despite the Order, Mr. Agpawa refused to issue any permits on the basis that

he needed time to review the applications and St. Coletta's contractor was not bonded or licensed

with the City.[26]  When Mr. Goodlow signed the permit for installation for the sprinkler system,

Mr. Agpawa stated that Mr. Goodlow had no authority to issue such permits and, thus, the permit

was invalid.[27]  The very next day, however, the City claimed that not only was the permit valid,

but that it should be considered to be the permit for both the installation of a sprinkler system and

fire alarm system.  Later that day, the City provided another permit for the installation of the fire

alarm system, also signed by Goodlow.

The Defendants have also unjustifiably required the Plaintiffs to obtain zoning approval

and a business license before opening.[28]  St. Coletta's is not required to obtain a business license

to operate the Home as a group home. St. Coletta's is not a "business" as that term is used under

the Code, which defines "business" as "vocations, occupations, professions, enterprises . . .

which are conducted for *private profit, or benefit, either directly or indirectly* . . . ."[29]  St.

Coletta's is indisputably a not-for-profit corporation that receives state funding for state

---

[24] Ex. B, ¶15.

[25] Ex. C, ¶¶19, 22.

[26] Ex. A, ¶17.

[27] Ex. A, ¶11.

[28] At the Planning Commission meeting, January 24, 2008, the City appeared to abandon it previous position that zoning approval was necessary for the Home to open as it was not discussed at the hearing.

[29] Ex. I, Code, §110.03.

programs designed to help disabled individuals. It does not engage in any activity for private profit or benefit. Moreover, the operation of the Home does not fit into any of the enumerated activities for which a business license is needed as set forth in the Code.[30] Tellingly, the City has never required St. Coletta's to obtain a business license for its *other* group home *in Markham*, which has been in operation since 1994.[31]   Furthermore, while the City maintains that St. Coletta's must obtain approval from the Planning Commission for a business license, the Code states that the issuance of business licenses is within the purview of the City Licensing Commission. Nowhere in the Code is the Planning Commission ordained with the authority to recommend or approve licenses.[32]

The sequence of events leading up to the dispute also clearly demonstrates the City's animus towards the Plaintiffs. The City sat on the sprinkler and fire alarm permit requests for months, claiming that the permits could not be issued without a business license or zoning approval.  Even though St. Coletta's disagreed with the City's position, it submitted the additional paperwork and sought expedited proceedings.[33]  The City "lost" the paperwork and then claimed that it could not expedite a meeting on the petition for zoning approval.[34]  When St. Coletta's finally appeared before the Planning Commission, the City failed to act on any issue related to St. Coletta's.[35]  To ensure that the Home's opening was thwarted, the Mayor ordered that the water to the Property be shut off.[36]  Even after the City was compelled to issue the

---

[30] Ex. I, Code, §110.15(B)(1)(a-g).
[31] Ex. B, ¶4.
[32] Ex. I, Code, §§ 32.139, 32.175, 32.176, 110.20 .
[33] Ex. B, ¶¶18-19.
[34] Ex. B, ¶ 22.
[35] Ex. C, ¶31.
[36] Ex. B, ¶45.

permits, the City dragged its' feet claiming that the permits could not be issued that day (nor were they issued that day as ordered by the Court).[37]

The City has not only been recalcitrant in dealing with St. Coletta's, it has continuously altered its directions and instructions to the Plaintiffs. The City initially claimed no rezoning was necessary for the permits, then it hired a consultant, who asserted a contrary opinion.[38] The City represented to St. Coletta's that it could schedule an expedited special Planning Commission meeting by paying an expedited fee, then the City "lost" the paperwork, and then told St. Coletta's that it could not schedule an expedited meeting.[39] Mr. Agpawa claims that he is the only person at the City with authority to issue permits,[40] yet St. Coletta's has two signed permits from Mr. Goodlow.[41]

The Defendants repeated departures from the City Code and its normal procedures, its fabricated "requirements", and discriminatory comments, coupled with a sequence of events demonstrating an irrefutable intent to delay and prevent the Home from opening, illustrate beyond doubt that the Defendants have deliberately and intentionally discriminated against the Plaintiffs in violation of both the ADA and FHA.

> b. The Evidence Demonstrates that the City Failed to Make a Reasonable Accommodation for the Plaintiffs.

The FHA prohibits "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B); *see also Developmental Services of Nebraska v. City of Lincoln*, 504 F.Supp. 2d 714, 723 (D. Neb. 2007). An

---

[37] Ex. A, ¶17.
[38] Ex. C, ¶23.
[39] Ex. B. ¶¶18-19, 22.
[40] Ex. A, ¶11.
[41] Ex. G.

11

accommodation is necessary where it will enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability. *Id.* The FHA amendments explicitly apply to ordinances, laws, and other land use regulations restricting the placement of group homes. *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 782 (7th Cir. 2002). Both the FHA and ADA apply to municipalities and their decisions. *Id.*

Even if this Court determines that the City did not intentionally discriminate against the Plaintiffs, the evidence is sufficient to show that the City failed to make a reasonable accommodation for the Plaintiffs in its requests for permits, a license and zoning approval.

> i.    The Defendants' Refusal to Issue the Sprinkler and Fire Alarm Permits Violates the FHA.

Chapter 32 of the Life Safety Code, which applies to group homes, mandates that any newly constructed group home be equipped with a fire alarm and sprinkler system. Without the installation of these systems, the Home cannot open. The City is fully aware that this Home must comply with these state regulations, yet the City remained inert in issuing the permits based on its erroneous assertion that a business license and zoning approval are prerequisites to obtain the permits.

The City's failure to issue the permits violates the FHA and ADA. There is no question that the installation of the fire alarm system and the sprinkler system are  reasonable and necessary to afford the Residents an equal opportunity to live in a residential community and necessary to ameliorate the effects of the Residents' disabilities. Therefore, the City's steadfast refusal to issue the permits until ordered to do so by this Court was not only in violation of its own procedures, but violative of both the FHA and ADA.

i.    The Defendants' Refusal to Issue a Business License or Zoning
Approval Violates the FHA and ADA.[42]

Assuming the City's position is correct that the Home requires a business license, the

City should have approved the license application instead of delaying the proceedings.

> Evidence showing heaps of red tape, garnished with bureaucratic indifference and
> inconsistent and irrelevant posturing by city officials. . . does not make the City. . .
> . guilty of consciously intending to discriminate against people with
> developmental disabilities, But that evidence and more, does prove that [the City]
> denies a group home provider and its developmentally disabled clients reasonable
> accommodations to land-use requirements. *Developmental Services of Nebraska
> v. City of Lincoln*, 504 F.Supp. 714, 717 (D. Neb. 2007).

The accommodations requested are reasonable. They will not impose an undue hardship on the

City. Under the City's tortured interpretation of its Code, St. Coletta's is unable to operate a

group home of six or less people *anywhere* in *any residential neighborhood* without first getting

the City's blessing in the form of a business license. Thus, granting the license is necessary to

afford the Residents of St. Coletta's an equal opportunity as any other resident to live in a

residential neighborhood of Markham. The City's failure to do so constitutes a violation of the

Plaintiffs' right to be free from discrimination.

**B.    Unless an Injunction is Granted, the Plaintiffs will Suffer Irreparable Harm
For Which They Have No Adequate Remedy at Law.**

Where a plaintiff shows a likelihood of success in proving a violation of the FHA or any

other statute providing for a grant of injunctive relief, irreparable injury is presumed. *North

Shore-Chicago Rehabilitation Inc.*, 827 F. Supp. At 509 (*citing Illinois Bell Tel. Co. v. Illinois

Commerce Comm'n*, 740 F. 2d 566, 571 (7th Cir. 1984)). Here, the Plaintiffs have made that

showing. Moreover, Plaintiffs can affirmatively demonstrate that they will sustain irreparable

injury if this Court does not intervene. If the City denies St. Coletta's request for a business

---

[42] The City has not yet decided whether St. Coletta's will be granted a business license, but assert that
both the City's claims that either of these requirements are necessary and the City's repeated failure to act
on St. Coletta's requests is sufficient to invoke protection under the FHA and ADA.

license, Mr. McMorris and the other Residents will have nowhere to live. Mr. McMorris will be separated from his roommates- in essence, his family, even though they have been together as a family for 10 years.[43]   The Residents' "family," one in which they have now lived for many years, would have to be fractured and fragmented. Uprooting and displacing the Residents from their current social and family circle would be disruptive and distressing to them, and work gratuitous cruelty against already-vulnerable people. It could also cause them emotional distress while destabilizing, if not causing deterioration in their developmental and mental health status. An injunction is necessary to spare Plaintiffs and the other Residents such unnecessary and irreparable harm.

### C.    The Balancing of Harms Favors Issuance of an Injunction.

The balancing of potential harms weighs heavily in favor of issuing an injunction. Absent an injunction, six developmentally disabled adults will be displaced in the dead of a Chicago winter while St. Coletta's Home stands vacant.   Their developmental and mental statuses would likely suffer completely unnecessary harm and would be forced to adapt to unfamiliar surroundings and new peers in the immediate wake of being torn from their family's support.   Defendants would not be prejudiced in the least by an injunction. St. Coletta's would proceed without a business license, or obtain such on an expedited basis to the extent such a license is deemed necessary. And Defendants cannot show any basis for their contention that the group home would somehow violate existing zoning.   There simply would be no harm to the City.   For all of these reasons, this Court should enter an order enjoining the Defendants from refusing to issue a building permit or from taking any other action to prevent Plaintiffs from opening and operating the group home.

---

[43] Ex. B, ¶11.

## CONCLUSION

For all of the foregoing reasons, the Plaintiffs respectfully request that this Court enter a preliminary injunction against Defendants City of Markham, David Webb, Jr., J.V. Cook, Sr., Thaddeus Goodlow and Roger Agpawa specifically:

(1)    prohibiting Defendants from further interfering with Plaintiffs rights to peacefully occupy and use the residence located 16207 S. Central Park, Markham, Illinois (the "Home") as a group home for disabled persons;

(2)    finding that St. Coletta's is not required to obtain a business license from the City's in order to open or operate the Home or alternatively that if a business license is required that such license and approvals issue from the City immediately;

(3)    prohibiting Defendants from otherwise violating the federal Fair Housing Act, the Americans with Disabilities Act and the Plaintiffs' Illinois and federal Constitutional rights to equal protection of the laws with respect to the Home or otherwise; and

(4)    granting such additional relief in Plaintiffs' favor and against Defendants as this Honorable Court deems fair, just and equitable in the premises, including without limitation an award of Plaintiffs' reasonable legal expenses, including reasonable attorneys' fees, incurred in preparing and presenting this Petition for Preliminary Injunction, such expenses to be proven by separate verified petition.

Dated:                                        Respectfully submitted,

                                                  /s/ Jamie A. Robinson
                                                  Nicholas Anaclerio
                                                  Jamie A. Robinson
                                                  UNGARETTI & HARRIS LLP
                                                  Three First National Plaza
                                                  Suite 3500
                                                  Chicago, Illinois 60602
                                                  Telephone (312) 977-4400
                                                  Facsimile (312) 977-4405

                                                  Counsel for Plaintiffs