UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ST. COLETTA'S OF ILLINOIS, INC.,<br>an Illinois not-for-profit corporation,<br>and JESSE McMORRIS, an individual,<br><br>        Plaintiffs,<br><br>  v.<br><br>CITY OF MARKHAM, an Illinois<br>municipal corporation, DAVID WEBB, JR.,<br>J.V. COOK, SR.,<br>THADDEUS GOODLOW and<br>ROGER AGPAWA,<br>individuals,<br><br>        Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **FILED**<br>**MARCH 10, 2008**<br>MICHAEL W. DOBBINS<br>CLERK, U.S. DISTRICT COURT<br><br>No. 2008 CV 409<br><br>**Senior District Judge**<br>**Milton I. Shadur**<br><br>**Magistrate Judge**<br>**Susan E. Cox**<br><br>**JURY DEMANDED** |

### SECOND AMENDED COMPLAINT

For their second amended complaint against the City of Markham (the "City" or "Markham"), David Webb, Jr. ("Mr. Webb"), J.V. Cook, Sr., ("Mr. Cook"), Thaddeus Goodlow ("Mr. Goodlow") and Roger Agpawa ("Mr. Agpawa"), (collectively the "Defendants"), Plaintiffs St. Coletta's of Illinois, Inc. ("St. Coletta's") and Jesse McMorris ("Mr. McMorris") (collectively "Plaintiffs") by their counsel Nicholas Anaclerio, Jamie A. Robinson and David Levitt of Ungaretti & Harris, LLP, state:

### NATURE OF ACTION

1.    This is an action to enjoin and redress Defendants' ongoing disability discrimination in housing, and to vindicate Plaintiffs' federal statutory and constitutional rights to enjoy the full and equal protection of the laws, particularly the laws pertaining to that most fundamental of human needs, suitable housing. By stalling Plaintiffs, by denying them requested municipal permits to which they have been entitled, by giving

1

1119257_1

Plaintiffs inconsistent direction and offering them inaccurate and unsupported interpretations of zoning and other ordinances, Defendants have deliberately, discriminatorily and unlawfully blocked St. Coletta's efforts to prepare and open a residential group home for disabled residents, including Mr. McMorris, at 16207 South Central Park in Markham, Illinois (the "Home"). Defendants' willful violations of federal law and the United States and Illinois Constitutions' guarantees of equal protection threatened to leave Mr. McMorris and his fellow residents without suitable and appropriate housing when their lease for their prior residence was set to expire on January 31, 2008. Based on groundless, ugly stereotypes abhorrent to federal law, Defendants have arbitrarily and illegally determined that they do not want Mr. McMorris and his fellow disabled residents in their "backyard," and that they will apply illegal means to keep them out.

2.      Once the Defendants learned that St. Coletta's intended to operate the Home as a residential group home for the disabled, they refused to issue St. Coletta's the permits necessary to improve it for operation as such. As part of a pretextual scheme of housing and disability discrimination, the City informed St. Coletta's that it needed both a business license and zoning approval before it would issue any permits, and on that basis the City withheld the permits. But under Markham's Code of Ordinances (the "Code"), St. Coletta's can lawfully use the Home for its intended purpose and needs no business license or zoning approval. St. Coletta's intended use of the Home conforms entirely to existing zoning without any need for further zoning approval or variance. Thus, Defendants "requirements" for issuance of the permits (that St. Coletta's first secure a business license and zoning approval), were not mandated by the Code or by any

2

other pertinent ordinance, law or regulation. And once Defendants erected their artificial business license and zoning barriers in Plaintiffs' path, they also manufactured a "process" to preclude St. Coletta's from obtaining the legally unnecessary business license and zoning approval. As part of its "process" for blocking Plaintiffs, the City has claimed that it "lost" St. Coletta's paperwork, deliberately failed to schedule an expedited Planning Commission hearing that St. Coletta's sought at City direction to obtain the necessary approvals, and issued St. Coletta's conflicting opinions and directions about what it was required to do to obtain the necessary approvals and permits for the Home. The City stood steadfastly inert, even after St. Coletta's requests for approval were undeniably properly before its Planning Commission, all to advance its unlawful objective to keep St. Coletta's prospective residents out.

3.    The City knows that it was imperative that the Home be ready by January 31, 2008, and that six developmentally disabled individuals, including Mr. McMorris, were waiting to enter St. Coletta's program and begin occupancy of the Home at that time. Each had a lease on an apartment that was set to expire at the end of January and had no appropriate substitute for that apartment on February 1, 2008 if they could not move into the Home. Despite its awareness of all of this, the City continued to give St. Coletta's and its prospective residents the "run-around," in the apparent hope that it can force them to seek refuge somewhere else. The Court should preliminarily and permanently enjoin Defendants' intentional violations of Federal law and Plaintiffs' Constitutional rights, award Plaintiffs their compensatory damages, their attorneys fees in prosecuting this action and further enter an award of punitive damages in Plaintiff's favor

to punish Defendants' illegal acts and to deter others from engaging in such reprehensible violations of the law in the future.

## PARTIES

4.     St. Coletta's is a not-for-profit organization organized under the laws of the State of Illinois and it is a 501(c)(3) tax exempt entity which has no owners, shareholders, or any other individuals who receive private benefit. St. Coletta's owns and operates approximately 30 not-for-profit residential group homes for physically, mentally and developmentally disabled persons in the southwest suburbs of Chicago.

5.     Mr. McMorris is a disabled individual who presently resides at 18131 South 66th Court, Tinley Park, Illinois.

6.     The City is a municipal corporation organized under the laws of the State of Illinois, with its principal municipal offices located at 16313 Kedzie Parkway Markham, Illinois 60426.

7.     Mr. Webb is an individual who is the City's Mayor.

8.     Mr. Cook is an individual who is the Chairman of the Planning Commission.

9.     Mr. Goodlow is an individual who is the City's Residential Building Inspector.

10.     Mr. Agpawa is an individual who is the City's Deputy Fire Chief.

## JURISDICTION AND VENUE

11.     Jurisdiction and venue are appropriate under 28 U.S.C. § 1331 because this Court has original jurisdiction of causes of action arising under the Federal Fair

1119257_1

Housing Act and the Americans with Disabilities Act and the acts of Defendants complained of herein occurred in Cook County, Illinois.

12.     Jurisdiction and venue are appropriate under 735 ILCS 5/2-103(a) because the City's principal office is located in Cook County Illinois, and the acts of Defendants complained of herein occurred in Cook County, Illinois, and because the Court has supplemental jurisdiction over Plaintiff's Illinois law claims.

## FACTS COMMON TO ALL COUNTS

13.     St. Coletta's owns and since 1994 has operated a residential group home located at 3829 West 154th Place in Markham, Illinois (the "Zolecki Home"). The Zolecki Home was not required to obtain a business license prior to its opening or at any time during its operation from 1994 to the present.

14.     On or about November 3, 2007, St. Coletta's purchased the Home, formerly a single family residence, for the purpose of opening a group home for six developmentally disabled persons.

15.     The Home is intended for six adult males who are developmentally, and in one case physically disabled, which disabilities substantially impair one or more of their major life activities. None of St. Coletta's residents have criminal backgrounds.

16.     St. Coletta's will provide 24-hour supervision for the residents in three eight-hour shifts by employees of St. Coletta's who do not reside or sleep at the Home. The employees also provide transportation services and assistance with activities of daily living, such as cooking and cleaning, paying bills and facilitating social interaction.

17. St. Coletta's also provides some prospective residents with job training, though some may never be able to work in the community at large due to their disabilities.

18. The Home is located on property that is zoned for single-family residential use.

19. Section 156.003 of the Code defines "family" as "[a] group of one or more persons occupying a building and living and cooking in a single dwelling unit. No unrelated group living and cooking in a single dwelling shall consist of more than six persons, as distinguished from a group occupying a lodginghouse or hotel." Copies of the relevant portions of the Code are attached as Group Exhibit 1.

20. Sections 156.051, 156.066, 156.081, 156.096, 156.111 of the Code permit one single-family dwelling on any lot or parcel in an R-1, R-2, R-3, R-3(a) or R-4 zoning district. Group Exhibit 1.

21. St. Coletta's has entered into contracts with six individuals for rooms at the Home.

22. One of these contracts is between St. Coletta's and Mr. McMorris, and pursuant to it Mr. McMorris is scheduled and entitled to move into the Home on February 1, 2008.

23. As of January 2008, Mr. McMorris lived with three other developmentally disabled persons at an apartment located at 18131 South 66th Court in Tinley Park, Illinois. Three of those individuals have been with St. Coletta's and at that apartment for over 10 years.

6

24.    St. Coletta's rented that apartment for its clients, including Mr. McMorris, and the lease was set to expire at the end of January 2008.

25.    These residents were scheduled to move into the Home at the beginning of February.

26.    St. Coletta's did not have a suitable housing alternative to the apartment other than the Home for Mr. McMorris or the other prospective disabled residents scheduled to move into the Home.

27.    On or about November 21, 2007, St. Coletta's through its agents and/or contractors applied to the City for a permit for the installation of a fire alarm system and sprinkler system, which work must be done in accordance with Illinois law.

28.    Mr. Goodlow informed St. Coletta's that before it could receive a permit, St. Coletta's would have to apply for a business license and also petition the City for approval of the Home's use.

29.    The Code sets forth the activities for which a business license is required.

30.    Specifically, Section 110.15 the Code provides that "any person is deemed to be in business or engaging in nonprofit enterprise, and thus subject to the requirements of this section and division (A) when he does one act of the following:

      a.   Selling any goods or service;

      b.   Soliciting business or offering goods or services for sale or hire;

      c.   Acquiring or using any vehicle or any premises in the city for business purposes;

      d.   Holds himself forth as being engaged in business or an occupation;

      e.   Solicits patronage, actively or passively, for a business or occupation;

7

     f.   Performs or attempts to perform any part of a business or occupation in the city; or

     g.   The holding or a garage or yard sale of used personal property.

Group Exhibit 1.

31.    While St. Coletta's maintains that these Code provisions do not require and have never required it to apply for or obtain a business permit for the Home, according to Section 110.18 of the Code, upon receipt of an application for a license, the City Clerk is required to refer the application to the Mayor within 48 hours for processing by the City License Commission. Group Ex. 1.

32.    According to Section 110.20 of the Code, the Mayor presents all applications for licenses with the recommendation of the City License Commission to the City Council for approval. Group Ex. 1.

33.    When St. Coletta's approached the City for the requisite paperwork to obtain a license, it informed the City Clerk that it needed an expedited hearing on the petition and application because the Home needed to be fully operational by the end of January 2008.

34.    The City Clerk informed St. Coletta's that the City would expedite a special meeting before the Planning Commission if St. Coletta's paid $500 with its petition.

35.    Relying on the advice and direction of both Mr. Goodlow and the City Clerk, on or about November 30, 2007, St. Coletta's filed its petition for approval, its application for a business license and tendered a $500 filing fee.

8

36.    The City made no response to St. Coletta's after St. Coletta's filed its petition and application for a business license and tendered the $500 filing fee. On or about December 11, 2007, St. Coletta's inquired with the City about the status of its petition, application and expedited meeting.

37.    City staff told St. Coletta's that it would have to speak to the City Clerk, who then informed St. Coletta's that she had no authority to schedule a Planning Commission meeting and that St. Coletta's would have to meet with Mr. Goodlow about the issue.

38.    When St. Coletta's met with Mr. Goodlow, he admitted that St. Coletta's request for expedited review of its petition before the Planning Commission had not been processed, claimed that it had been misplaced, stated that he would try to get the petition expedited and that at least St. Coletta's would be on the next regular meeting agenda scheduled for January 9, 2008.

39.    Mr. Goodlow also advised St. Coletta's that the City was having "trouble" with some other existing group homes in the City because they "allowed rapists and criminals" into the City.

40.    At that time, St. Coletta's expressed to Mr. Goodlow that it believed that neither a license nor a petition were necessary under the Code. Mr. Goodlow reviewed the Code, but then claimed he would need to speak to an unnamed alderperson.

41.    Mr. Goodlow then purported to make a call to the alderperson, and after the call, advised St. Coletta's that it needed to have a hearing before the Planning Commission.

1119257_1

42.    Mr. Agpawa joined the meeting and stated that he had no problems or issues with the Zolecki Home, but advised St. Coletta's that he could not issue the permits without the necessary license and approvals.

43.    St. Coletta's expressed concern about the delay in the proceedings due to the fact that the Home was scheduled to open at the end of January 2008, and that if it did not open, its prospective residents would be without suitable lodging because their lease expired at the end of January 2008.

44.    Mr. Goodlow then advised St. Coletta's to meet with the Mayor for better directions.

45.    When St. Coletta's approached the Mayor's office for further direction, the Mayor's secretary refused to let St. Coletta's see the Mayor, referring them instead back to Mr. Goodlow.

46.    After Mr. Goodlow, Mr. Agpawa and the City Clerk advised St. Coletta's that it needed City approval for use of the Home as a residential group home, the City Council's attorney, Steven Miller ("Mr. Miller"), was contacted by St. Coletta's for clarification.

47.    After numerous calls and several letters, Mr. Miller advised St. Coletta's that he did not believe that the Code required any zoning approval for St. Coletta's to use the Home for its intended purpose as a residential group home.

48.    Mr. Miller also advised St. Coletta's to meet with the Planning Commission on January 9, 2008 and seek approval and issuance of a business license as a pre-condition to St. Coletta's getting on the City Council's agenda for January 16, 2008 even though the Planning Commission has no responsibility for approving licenses.

1119257_1

49.     St. Coletta's requested that the permits be issued while St. Coletta's other requests were pending. St. Coletta's request was denied.

50.     Although St. Coletta's paid $500 to "expedite" the Planning Commission's hearing on St. Coletta's request, no expedited hearing before the Commission was scheduled prior to the January 9, 2008 regular meeting.

51.     St. Coletta's appeared before the City's Planning Commission on January 9, 2008, only to learn that prior to the meeting, the Planning Commission received a report by a consultant hired by the City, in which the consultant recommended that the Planning Commission reject St. Coletta's petition for approval on the supposed basis that a residential group home would be a non-conforming use for which zoning approval was required.

52.     The consultant's position, to the extent it was shared during the Planning Commission meeting, completely contradicted Mr. Miller's previous legal opinion that St. Coletta's did not need to apply for a rezoning of the Property, and is in fact at odds with, and unsupported by, the Code's plain language.

53.     The City did not provide St. Coletta's with a copy of the consultant's report before or even at the January 9, 2008 Planning Commission hearing.

54.     At the hearing, St. Coletta's expressed to the Planning Commission that it believed its proposed use was permitted by existing zoning and that no business license was even necessary under the Code.  Despite St. Coletta's position, in an effort to facilitate timely opening of the Home and prevent displacement of the prospective residents, St. Coletta's requested that the Planning Commission: 1) approve the use; 2) approve the business license and record it to the City so St. Coletta's could be placed on

11

the January 16, 2008 City Council meeting agenda for approval of the business license; and 3) instruct the City staff to issue the permits for the sprinkler and fire alarm system.

55.    On the public record, Mr. Goodlow advised the Planning Commission that St. Coletta's and the seller of the Property provided fraudulent and misleading information to the City in order to obtain an occupancy permit for the Property and that he would never have issued the certificate of occupancy if he had known that it was going to be used as a group home.

56.    The Planning Commission also acknowledged that St. Coletta's petition and application has been misplaced, yet it refused to expedite any further necessary proceedings (which St. Coletta's paid to have expedited).

57.    When the Planning Commission opened the floor for general discussion, several Markham residents spoke out against St. Coletta's opening of the Home expressing concern about St. Coletta's residents being criminals and sexual predators.

58.    St. Coletta's confirmed that none of its residents have criminal backgrounds.

59.    After the open session, the Planning Commission's other and newly appointed attorney, Michelle Broughton-Fountain (*not* Mr. Miller, whose zoning opinion had supported St. Coletta's planned use of the Home) suggested that the Planning Commission needed additional time to consider the conclusions of its consultant and her own legal opinion to the Planning Commission.

60.    As a result, the Planning Commission refused to address St. Coletta's requests, failed to make any recommendation to the City Council and refused to authorize the addition of St. Coletta's to the City Council's meeting agenda for January 16, 2008.

12

61.     St. Coletta's petition was tabled until the next regularly scheduled Planning Commission meeting, which the City knew would be too late to facilitate the January 31, 2008 deadline.

62.     At the meeting, the Planning Commission also informed St. Coletta's that it needed to pay an additional $250.00 for a special Planning Commission meeting, even though St. Coletta's had been told that it would only cost $500.00 for an expedited hearing.

63.     On January 10, 2008, St. Coletta's paid the additional $250.00 for an expedited hearing.

64.     The City never scheduled a special Planning Commission meeting concerning St. Coletta's application.

65.     On or about January 9, 2007, St. Coletta's was informed by the City that the Mayor instructed that the water to the Property be turned off without notice, even though there was no delinquency in the water bill payments for the Property.

66.     On January 29, 2008, Judge Milton I. Shadur of the U.S. District Court for the Northern District of Illinois entered an order requiring Markham to issue permits for the installation of a fire alarm system and sprinkler system.

67.     Later that same day, despite his knowledge of Judge Shadur's order, Mr. Agpawa refused to issue permits for the installation of a fire alarm system and sprinkler system

### COUNT I
### (Violations of the Fair Housing Act)

68.     Plaintiffs incorporate their allegations contained in Paragraphs 1-65 as and for their allegations for this paragraph as though fully set forth herein.

13

69.     The Fair Housing Act ("FHA") makes it unlawful for anyone not exempt under the FHA "to discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of . . . a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available."  42 U.S.C. § 3604(f)(1)(B).

70.     The Fair Housing Act also makes it unlawful to "interfere with any person in the exercise or enjoyment of . . . any right granted or protected by section 3603, 3604, 3605, or 3606 of this title."  42 U.S.C. § 3617.

71.     The FHA defines "Handicap" in part as "a physical or mental impairment which substantially limits one or more of such person's major life activities." 42 U.S.C. 3602(h)(1).

72.     Mr. McMorris and his fellow prospective residents are handicapped persons as that term is defined by the FHA.  Mr. McMorris's handicap substantially limits him from living independently, requires that he be supervised and assisted in cooking, cleaning and managing his finances, and otherwise substantially limits him in performing one or more major life activities.

73.     The other residents of St. Coletta's also have handicaps which substantially limit them in performing one or more major life activities.

74.     Through the actions of its Planning Commission, other officials and staff, the City has unlawfully and intentionally discriminated against St. Coletta's, Mr. McMorris and his fellow prospective disabled residents, by refusing to issue to St. Coletta's the permits necessary for the Home to open.

14

75.    Through the actions of its Planning Commission, other officials and staff, the City has unlawfully and intentionally interfered with St. Coletta's, Mr. McMorris's and his fellow prospective residents' use and enjoyment of the Property by refusing to issue to St. Coletta's the permits necessary for the Home to open.

76.    Through the actions of its Planning Commission, other officials and staff, the City has unlawfully and intentionally discriminated against St. Coletta's, Mr. McMorris and his fellow prospective disabled residents in violation of the FHA by deliberately delaying and blocking the issuance of the permits necessary for the Home to open, despite being permitted by the Code .

77.    The City's unlawful discriminatory intent in delaying and ultimately refusing to issue the permits is evinced by one or more the following acts or failures to act:

      a.    The City's failure to schedule a special Planning Commission meeting even though St. Coletta's paid a fee to expedite a hearing;

      b.    The City's inability to identify any City official who was responsible for scheduling a special Planning Commission meeting;

      c.    The City's failure to notify St. Coletta's that its petition and application had been lost, and/or its false claim respecting the supposed "loss" of such documents;

      d.    The City's contradicting opinions regarding the requirements St. Coletta's was to meet to open the Home;

      e.    Mr. Goodlow's statement that group homes were bringing criminals and sexual offenders into the City and that St. Coletta's had provided

15

fraudulent information to the City to obtain its occupancy permit and that he never would have issued the permit had he known it was for a group home;

f.  The City's refusal to allow St. Coletta's to proceed with installing the fire alarm and sprinkler systems at their own risk while their request for a business license and zoning approval were pending;

g.  The City's refusal to act upon St. Coletta's requests after the Planning Commission meeting on January 9, 2008, despite its awareness of the urgency of having the Home opened by January 31, 2008;

h.  The City's refusal to put St. Coletta's on the City Council's agenda for January 16, 2008, despite its awareness of the urgency in having the Home opened by January 31, 2008;

i.  The City's refusal to expedite a Planning Commission meeting after St. Coletta's paid an additional $250 for an expedited meeting, for a total of $750 in expedited fees;

j.  The Mayor instructing the City to turn off the water to the Property without notice to St. Coletta's and without any delinquency in payment of the water bills for the Home.

78.    Mr. Goodlow has personally and intentionally discriminated against the Plaintiffs in one or more of the foregoing respects including by stalling and fabricating the proceedings and requirements for St. Coletta's to open and operate the Home as a group home; by misleading St. Coletta's as to the process necessary for St. Coletta's to obtain permits necessary to open the Home; by failing to issue or facilitate issuance of the

necessary permits to St. Coletta's; by failing to notify St. Coletta's that its application and petition had been lost or by falsely claiming that such documents were lost when indeed they were not; and by failing to schedule a special Planning Commission meeting even though St. Coletta's requested and paid for an expedited hearing; by accusing St. Coletta's of fraud and stating that he would have never issued an occupancy permit for the Property if he had known that it was going to be a group home; and by stating that group homes were bringing criminals and rapists into the City.

79. The Mayor, Mr. Webb has personally and intentionally discriminated against the Plaintiffs in one or more of the foregoing respects including by stalling and fabricating the proceedings and requirements for St. Coletta's to open and operate the Home as a group home; and by instructing the City to turn the water off to the Property, without notice to St. Coletta's and despite the fact that St. Coletta's is and has always been current on its water bills.

80. The Planning Commission including Mr. Cook, has personally and intentionally discriminated against the Plaintiffs in one or more of the foregoing respects including by stalling and fabricating the proceedings and requirements for St. Coletta's to open and operate the Home as a group and the process by which St. Coletta's has been required to obtain permits necessary to open the Home; failing to issue the necessary permits; failing to recommend approval of the Home for use as a residential group home, failing to recommend approval of St. Coletta's application for a business license; failing to hold a special Planning Commission meeting even though St. Coletta's requested an expedited and paid for an expedited hearing; and failing to put these foregoing issues before the City Council as requested by St. Coletta's.

17

81.    Mr. Agpawa has personally and intentionally discriminated against the Plaintiffs in one or more of the foregoing respects including by stalling and fabricating the proceedings and requirements for St. Coletta's to open and operate the Home as a group and the process by which St. Coletta's has been required to obtain permits necessary to open the Home; failing to issue and/or sign the necessary permits, even after receiving notice of Judge Shadur's Order requiring him do so; manufacturing unlawful and unnecessary requirements that he sign municipal permits in order to validate them for St. Coletta's use; and manufacturing unlawful and unnecessary requirements for changes to the sprinkler system installation plan for the Home.

82.    The personal, knowing, deliberate and willful nature of the acts of housing discrimination perpetrated against the Plaintiffs by each and all of the Defendants herein, particularly Mr. Webb, Mr. Goodlow, Mr. Cook, and Mr. Agpawa, is further evidenced by the fact that in or about January 2007, the Defendant City and Defendant Webb entered into a conciliation agreement (the "HUD Agreement") with the United States Department of Housing and Urban Development ("HUD"), resolving the housing and disability discrimination complaint of another operator of a Markham group home for the developmentally disabled, Karriem's Development Services, Inc. ("Karriem's") located at 15501 S. Kedzie Avenue in Markham, Illinois.  Karriem's prior housing discrimination complaint against the City, and Defendant Webb, among others (the "Karriem Complaint") alleged that although the Defendant City issued Karriem's a business license in August 2001, it nevertheless also issued Karriem's a citation and fined Karriem's on September 25, 2006 for an alleged failure to obtain a business license and for operating a commercial business within a residential area.  While there had never been any untoward

18

incidents involving Karriem's or its disabled residents, the Defendant City nevertheless targeted Karriem's and its residents for disability-based housing discrimination and harassment.

83.     The terms of the HUD Agreement (a true copy of which is appended hereto and made a part hereof as Exhibit 2 ) require that the Defendant City and Defendant Webb:

    a.     "immediately cease and desist allowing harassment through the use of City personnel and citations of violations against the [Karriem's] property at issue;"

    b.     "treat [Karriem's and its residents] with dignity and respect;" and

    c.     not "interfere, harass, delay or treat less favorably [Karriem's] future efforts to obtain business licensing, and/or to operate group home housing."

84.     Through the HUD Agreement (Ex. 2, pp. 5-6, par. 16), the Defendant City, and Defendant Webb expressly acknowledged the provisions of the federal housing discrimination laws that they violated with respect to St. Coletta's within 10 months of signing the HUD Agreement. Specifically, in the HUD Agreemnent (Ex. 2, pp. 5-6, ¶ 16), among other things, Defendants "acknowledge[d] that The Fair Housing Act makes it unlawful:

•   To utilize land use policies or actions that treat groups of persons with disabilities less favorably than groups of non-disabled persons. An example would be an ordinance prohibiting housing for persons with disabilities or a specific type of disability, such as mental illness, from locating in a particular area, while allowing other groups of unrelated individuals to live together in that area.

•   To take action against, or deny a permit, for a home because of the disability of individuals who live or would live there. *An example would be denying a building permit for a home because it was intended to provide housing for persons with mental retardation.* (emphasis added)

19

- To refuse to make reasonable accommodations in land use and zoning policies and procedures where such accommodations may be necessary to afford persons or groups of persons with disabilities an equal opportunity to use and enjoy housing."

85.    The HUD Agreement (Ex. 2, p. 6, par. 17) bound the Defendant City and Defendant Webb, within 30 days of its signing, to "agree to communicate the provisions of the [HUD] Agreement to their respective employees, agents and all persons having any responsibilities or duties related to the provisions of this Agreement, and to provide the Department [HUD] with a certification that this requirement has been met."

86.    By virtue of the Karriem's Complaint and the HUD Agreement, Defendants and each of them had actual and direct knowledge of the requirements of federal housing law that they then proceeded to deliberately violate in regard to the Plaintiffs.

WHEREFORE, the Plaintiffs respectfully request that this Court enter an order in their favor and against the Defendants:

a.    permanently enjoining the City and all of its officials and agents, including without limitation the Planning Commission and Mr. Goodlow, from engaging in further unlawful discrimination and violations of the FHA against the Plaintiffs and the other residents of the Home.

b.    awarding judgment in Plaintiffs' favor and against the Defendants for all damages incurred by Plaintiffs related to the delay in opening the Home;

c.    awarding judgment in Plaintiffs' favor and against the Defendants Mr. Webb, Mr. Cook, Mr. Goodlow, Mr. Roger Agpawa, for punitive and

20

exemplary damages to punish their violations of the FHA and to deter others from committing such acts in the future;

d.      awarding judgment in Plaintiffs' favor and against the Defendants for Plaintiffs' costs and attorneys fees in prosecuting this action; and

e.      for such other further relief as this Court deems fair, just, and equitable in the premises.

## COUNT II
### (Violations of the Americans with Disabilities Act)

87.      Plaintiffs incorporate their allegations contained in Paragraphs 1-86 as and for their allegations for this paragraph as though fully set forth herein.

88.      The Americans with Disabilities Act (the "ADA") makes it unlawful for a public entity to discriminate against a disabled individual based on that individual's disability. 42 U.S.C. § 12132.

89.      The ADA defines "Disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A).

90.      The ADA defines "Public entity" as any state or local government, department, agency, special purpose district, or other instrumentality of a state or states or local government. 42 U.S.C. § 12131(1)(A)-(B).

91.      Mr. McMorris has a disability as the ADA defines that term because he has a physical or mental impairment that substantially limits him in one or more major life activities, including without limitation living independently and without supervision or assistance in performing activities of daily living.

92.    Mr. McMorris's fellow prospective residents of the Home are also disabled for purposes of the ADA, substantially limited in one or more major life activities.

93.    Through the actions of its Planning Commission, other officials and staff, the City has unlawfully discriminated against the Plaintiffs in violation of the ADA by refusing to issue to St. Coletta's the permits necessary for the Home to open.

94.    Through the actions of its Planning Commission, other officials and staff, the City has unlawfully discriminated against the Plaintiffs in violation of the ADA by intentionally delaying the issuance of the permits necessary for the Residential Group Home to open.

95.    The City's unlawful discriminatory intent is evinced by one or more of the following acts or omissions to act:

    a.    The City's failure to schedule a special Planning Commission meeting even though St. Coletta's paid a fee to expedite a hearing;

    b.    The City's inability to identify any City official who was responsible for scheduling a special Planning Commission meeting;

    c.    The City's failure to notify St. Coletta's that its petition and application had been lost, and/or its false claim respecting the supposed "loss" of such documents;

    d.    The City's contradicting opinions regarding the requirements St. Coletta's was to meet to open the Home;

    e.    Mr. Goodlow's statement that group homes were bringing criminals and sexual offenders into the City and that St. Coletta's had provided

fraudulent information to the City to obtain its occupancy permit and that he never would have issued the permit had he known it was for a group home;

f.  The City's refusal to allow St. Coletta's to proceed with installing the fire alarm and sprinkler systems at their own risk while their request for a business license and zoning approval were pending;

g.  The City's refusal to act upon St. Coletta's requests after the Planning Commission meeting on January 9, 2008, despite its awareness of the urgency of having the Home opened by January 31, 2008;

h.  The City's refusal to put St. Coletta's on the City Council's agenda for January 16, 2008, despite knowing the urgency in having the Home opened by January 31, 2008;

i.  The City's refusal to expedite a Planning Commission meeting after St. Coletta's paid an additional $250 for an expedited meeting, for a total of $750 in expedited fees;

j.  The Mayor instructing the City to turn off the water to the Property without notice to St. Coletta's and without any delinquency in payment of the water bills for the Home.

96.    Mr. Goodlow has personally and intentionally discriminated against the Plaintiffs in one or more of the foregoing respects including by stalling and fabricating the proceedings and requirements for St. Coletta's to open and operate the Home as a group home; by misleading St. Coletta's as to the process necessary for St. Coletta's to obtain permits necessary to open the Home; by failing to issue or facilitate issuance of the

necessary permits to St. Coletta's; by failing to notify St. Coletta's that its application and petition had been lost or by falsely claiming that such documents were lost when indeed they were not; and by failing to schedule a special Planning Commission meeting even though St. Coletta's requested and paid for an expedited hearing; by accusing St. Coletta's of fraud and stating that he would have never issued an occupancy permit for the Property if he had known that it was going to be a group home; and by stating that group homes were bringing criminals and rapists into the City.

97.    The Mayor, Mr. Webb has personally and intentionally discriminated against the Plaintiffs in one or more of the foregoing respects including by stalling and fabricating the proceedings and requirements for St. Coletta's to open and operate the Home as a group home; and by instructing the City to turn the water off to the Property, without notice to St. Coletta's and despite the fact that St. Coletta's is current on its water bills.

98.    The Planning Commission including Mr. Cook, has personally and intentionally discriminated against the Plaintiffs in one or more of the foregoing respects including by stalling and fabricating the proceedings and requirements for St. Coletta's to open and operate the Home as a group and the process by which St. Coletta's has been required to obtain permits necessary to open the Home; failing to issue the necessary permits; failing to recommend approval of the Home for use as a residential group home, failing to recommend approval of St. Coletta's application for a business license; failing to hold a special Planning Commission meeting even though St. Coletta's requested an expedited and paid for an expedited hearing; and failing to put these foregoing issues before the City Council as requested by St. Coletta's.

24

99.     Mr. Agpawa has personally and intentionally discriminated against the Plaintiffs in one or more of the foregoing respects including by stalling and fabricating the proceedings and requirements for St. Coletta's to open and operate the Home as a group and the process by which St. Coletta's has been required to obtain permits necessary to open the Home; failing to issue and/or sign the necessary permits, even after receiving notice of Judge Shadur's Order requiring him do so; manufacturing unlawful and unnecessary requirements that he sign municipal permits in order to validate them for St. Coletta's use; and manufacturing unlawful and unnecessary requirements for changes to the sprinkler system installation plan for the Home.

WHEREFORE, the Plaintiffs respectfully request that this Court enter an order in their favor and against the Defendants:

        a.      for a permanently enjoining the City, its officials and staff including without limitation, its Planning Commission and Mr. Goodlow, from engaging in further discrimination and violations of the ADA against the Plaintiffs and the other prospective disabled residents of the Home;

        b.      awarding judgment against the Defendants and in favor of Plaintiffs for all damages incurred by the Plaintiffs related to the delay in opening the Home;

        c.      awarding judgment against the Defendants and in favor of Plaintiffs for Plaintiffs' costs and attorneys fees incurred in prosecuting this action;

25

d.    for such other further relief in Plaintiffs' favor and against the

Defendants as that this Court deems fair, just and equitable in the

premises.

## COUNT III
### (Violations of the Rehabilitation Act of 1973)

100.    Plaintiffs incorporate their allegations contained in Paragraphs 1-109 as

and for its allegations for this paragraph as though fully set forth herein.

101.    The Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794,

makes it unlawful for any municipality receiving federal government funds to

discriminate against any disabled individual based on that individual's disability, and

because, on information and belief, the Defendant City is a recipient of federal

government funds for Rehabilitation Act purposes, it is subject to the prohibitions on

disability discrimination set forth therein.

102.    The Rehabilitation Act defines "Disability" as "a physical or mental

impairment that substantially limits one or more major life activities."  29 U.S.C. §

705(9)(b).

103.    Mr. McMorris has a disability as the Rehabilitation Act defines that term

because he has a physical or mental impairment that substantially limits him in one or

more major life activities, including without limitation, living independently and without

supervision or assistance in performing activities of daily living.

104.    Mr. McMorris's fellow prospective residents of the Home are also

disabled for purposes of the Rehabilitation Act, substantially limited in one or more

major life activities.

105.　Through the actions of its Planning Commission, other officials and staff, the City has unlawfully discriminated against the Plaintiffs in violation of the Rehabilitation Act by refusing to issue to St. Coletta's the permits necessary for the Home to open.

106.　Through the actions of its Planning Commission, other officials and staff, the City has unlawfully discriminated against the Plaintiffs in violation of the Rehabilitation Act by intentionally delaying the issuance of the permits necessary for the Residential Group Home to open.

107.　The City's unlawful discriminatory intent is evinced by one or more of the following acts or omissions to act:

    a.　The City's failure to schedule a special Planning Commission meeting even though St. Coletta's paid a fee to expedite a hearing;

    b.　The City's inability to identify any City official who was responsible for scheduling a special Planning Commission meeting;

    c.　The City's failure to notify St. Coletta's that its petition and application had been lost, and/or its false claim respecting the supposed "loss" of such documents;

    d.　The City's contradicting opinions regarding the requirements St. Coletta's was to meet to open the Home;

    e.　Mr. Goodlow's statement that group homes were bringing criminals and sexual offenders into the City and that St. Coletta's had provided fraudulent information to the City to obtain its occupancy permit and that

27

he never would have issued the permit had he known it was for a group home;

f.  The City's refusal to allow St. Coletta's to proceed with installing the fire alarm and sprinkler systems at their own risk while their request for a business license and zoning approval were pending;

g.  The City's refusal to act upon St. Coletta's requests after the Planning Commission meeting on January 9, 2008, despite its awareness of the urgency of having the Home opened by January 31, 2008;

h.  The City's refusal to put St. Coletta's on the City Council's agenda for January 16, 2008, despite knowing the urgency in having the Home opened by January 31, 2008;

i.  The City's refusal to expedite a Planning Commission meeting after St. Coletta's paid an additional $250 for an expedited meeting, for a total of $750 in expedited fees;

j.  The Mayor instructing the City to turn off the water to the Property without notice to St. Coletta's and without any delinquency in payment of the water bills for the Home.

108.    Mr. Goodlow has personally and intentionally discriminated against the Plaintiffs in one or more of the foregoing respects including by stalling and fabricating the proceedings and requirements for St. Coletta's to open and operate the Home as a group home; by misleading St. Coletta's as to the process necessary for St. Coletta's to obtain permits necessary to open the Home; by failing to issue or facilitate issuance of the necessary permits to St. Coletta's; by failing to notify St. Coletta's that its application and

petition had been lost or by falsely claiming that such documents were lost when indeed they were not; and by failing to schedule a special Planning Commission meeting even though St. Coletta's requested and paid for an expedited hearing; by accusing St. Coletta's of fraud and stating that he would have never issued an occupancy permit for the Property if he had known that it was going to be a group home; and by stating that group homes were bringing criminals and rapists into the City.

109.    The Mayor, Mr. Webb has personally and intentionally discriminated against the Plaintiffs in one or more of the foregoing respects including by stalling and fabricating the proceedings and requirements for St. Coletta's to open and operate the Home as a group home; and by instructing the City to turn the water off to the Property, without notice to St. Coletta's and despite the fact that St. Coletta's is current on its water bills.

110.    The Planning Commission including Mr. Cook, has personally and intentionally discriminated against the Plaintiffs in one or more of the foregoing respects including by stalling and fabricating the proceedings and requirements for St. Coletta's to open and operate the Home as a group and the process by which St. Coletta's has been required to obtain permits necessary to open the Home; failing to issue the necessary permits; failing to recommend approval of the Home for use as a residential group home, failing to recommend approval of St. Coletta's application for a business license; failing to hold a special Planning Commission meeting even though St. Coletta's requested an expedited and paid for an expedited hearing; and failing to put these foregoing issues before the City Council as requested by St. Coletta's.

29

111.    Mr. Agpawa has personally and intentionally discriminated against the Plaintiffs in one or more of the foregoing respects including by stalling and fabricating the proceedings and requirements for St. Coletta's to open and operate the Home as a group and the process by which St. Coletta's has been required to obtain permits necessary to open the Home; failing to issue and/or sign the necessary permits, even after receiving notice of Judge Shadur's Order requiring him do so; manufacturing unlawful and unnecessary requirements that he sign municipal permits in order to validate them for St. Coletta's use; and manufacturing unlawful and unnecessary requirements for changes to the sprinkler system installation plan for the Home.

WHEREFORE, the Plaintiffs respectfully request that this Court enter an order in their favor and against the Defendants:

a.    for a permanently enjoining the City, its officials and staff including without limitation Defendants, from engaging in further discrimination and violations of the Rehabilitation Act against the Plaintiffs and the other prospective disabled residents of the Home;

b.    awarding judgment against the Defendants and in favor of Plaintiffs for all damages incurred by the Plaintiffs related to the delay in opening the Home;

c.    awarding judgment against the Defendants and in favor of Plaintiffs for Plaintiffs' costs and attorneys fees incurred in prosecuting this action;

d.  for such other further relief in Plaintiffs' favor and against the

Defendants as that this Court deems fair, just and equitable in the

premises.

## COUNT IV
### (42 U.S.C. § 1983 Action)

112.  Plaintiffs incorporate their allegations contained in Paragraphs 1-111 as

and for its allegations for this paragraph as though fully set forth herein.

113.  Defendants' treatment of Plaintiffs and of the other prospective residents

of the Home, as alleged herein, effectuates a deprivation of their federal Constitutional

rights to equal protection of the law, in that, on information and belief Defendants have

singled out Plaintiffs and the other prospective residents of the Home for such treatment

and not treated similarly-situated non-disabled individuals in a like manner with respect

to Defendants' interpretation and application of the Code, issuance of permits, issuance

of business licenses, convening of Building Commission and City Council meetings, and

provision or discontinuation of residential water service.

114.  Defendants' deprivation of the federal Constitutional rights of Plaintiffs

was done under the color of state law.

115.  Defendants' deprivation of the federal Constitutional rights of Plaintiffs

was, upon information and belief, made with evil intent and in reckless disregard for and

deliberate indifference to, Plaintiffs' Constitutional rights.

WHEREFORE, the Plaintiffs respectfully request that this Court enter an order in

their favor and against the Defendants:

31

a.  permanently enjoining the City, its officials and staff including without limitation Defendants, from otherwise abridging Plaintiffs' Illinois State and federal Constitutional rights to equal protection of the laws;

b.  awarding judgment in Plaintiffs' favor and against Defendants for all damages incurred by Plaintiffs related to the delay in opening the Home;

c.  awarding judgment in Plaintiffs' favor and against the Defendants Mr. Webb, Mr. Cook, Mr. Goodlow, Mr. Agpawa, for punitive and exemplary damages to punish their violations of The Fourteenth Amendment of the United States Constitution and to deter others from committing such acts in the future;

d.  awarding judgment in Plaintiffs' favor and against Defendants for all of Plaintiffs' costs and attorneys fees incurred in prosecuting this action, pursuant to 42 U.S.C. § 1988(b);

e.  granting such other or additional relief in Plaintiffs' favor and against Defendants as this Court deems fair, just and equitable in the premises.

## COUNT V
### (Equal Protection Violations – Federal Law)

116.    Plaintiffs incorporate their allegations contained in Paragraphs 1-115 as and for its allegations for this paragraph as though fully set forth herein.

117.    The Fourteenth Amendment of the United States Constitution provides that no State shall "deprive any person of life, liberty or property without due process of

law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST., amend. XIV, § 1.

118.    Due process and equal protection require that governments treat similarly situated individuals in a similar fashion.

119.    Defendants' treatment of Plaintiffs and of the other prospective residents of the Home, as alleged herein, effectuates a deprivation of their federal Constitutional rights to equal protection of the law in that, on information and belief Defendants have singled out Plaintiffs and the other prospective residents of the Home for such treatment and not treated similarly-situated non-disabled individuals in a like manner with respect to Defendants' interpretation and application of the Code, issuance of permits, issuance of business licenses, convening of Building Commission and City Council meetings, and provision or discontinuation of residential water service.

WHEREFORE, the Plaintiffs respectfully request that this Court enter an order in their favor and against the Defendants:

a.    permanently enjoining the City, its officials and staff including without limitation Defendants, from otherwise abridging Plaintiffs' federal Constitutional rights to equal protection of the laws;

b.    awarding judgment in Plaintiffs' favor and against Defendants for all damages incurred by Plaintiffs related to the delay in opening the Home;

c.    awarding judgment in Plaintiffs' favor and against the Defendants Mr. Webb, Mr. Cook, Mr. Goodlow, Mr. Agpawa, for punitive and exemplary damages to punish their violations of The Fourteenth

33

Amendment of the United States Constitution and to deter others
from committing such acts in the future;

d.      awarding judgment in Plaintiffs' favor and against Defendants for
all of Plaintiffs' costs and attorneys fees incurred in prosecuting
this action;

e.      granting such other or additional relief in Plaintiffs' favor and
against Defendants as this Court deems fair, just and equitable in
the premises.

## COUNT VI
### (Equal Protection Violations – Illinois Law)

120.    Plaintiffs incorporate their allegations contained in Paragraphs 1-119 as
and for its allegations for this paragraph as though fully set forth herein.

121.    Article I, Section 2 of the Illinois Constitution entitled "Due Process and
Equal Protection" provides that "[n]o person shall be deprived of life, liberty or property
without due process of law nor be denied the equal protection of the laws." ILL. CONST.,
art. I, § 2.

122.    Due process and equal protection require that governments treat similarly
situated individuals in a similar fashion.

123.    Defendants' treatment of Plaintiffs and of the other prospective residents
of the Home, as alleged herein, effectuates a deprivation of their Illinois Constitutional
rights to equal protection of the law in that, on information and belief Defendants have
singled out Plaintiffs and the other prospective residents of the Home for such treatment
and not treated similarly-situated non-disabled individuals in a like manner with respect
to Defendants' interpretation and application of the Code, issuance of permits, issuance

34

of business licenses, convening of Planning Commission and City Council meetings, and provision or discontinuation of residential water service.

WHEREFORE, the Plaintiffs respectfully request that this Court enter an order in their favor and against the Defendants:

a. permanently enjoining the City, its officials and staff including without limitation Defendants, from otherwise abridging Plaintiffs' Illinois State Constitutional rights to equal protection of the laws;

b. awarding judgment in Plaintiffs' favor and against Defendants for all damages incurred by Plaintiffs related to the delay in opening the Home;

c. awarding judgment in Plaintiffs' favor and against the Defendants Mr. Webb, Mr. Cook, Mr. Goodlow, Mr. Agpawa, for punitive and exemplary damages to punish their violations of Article I, Section 2 of the Illinois Constitution and to deter others from committing such acts in the future;

d. awarding judgment in Plaintiffs' favor and against Defendants for all of Plaintiffs' costs and attorneys fees incurred in prosecuting this action;

e. granting such other or additional relief in Plaintiffs' favor and against Defendants as this Court deems fair, just and equitable in the premises.

**COUNT VII**
**(Injunctive Relief)**

35

124.    Plaintiffs incorporate their allegations contained in Paragraphs 1-123 as and for their allegations for this paragraph as though fully set forth herein.

125.    The Plaintiffs and the other prospective residents have a valid, protectable interest in occupying the Home.

126.    St. Coletta's is the rightful owner of the Home, and, therefore, has a valid interest in installing a sprinkler system and fire alarm to safeguard the Property and inhabitants therein from the risk of fire.

127.    Plaintiffs are substantially likely to prevail on the merits in proving that St. Coletta's is entitled to a permit; that St. Coletta's is entitled to open and operate the Home as a group home; that the Plaintiffs and the other prospective residents are entitled to live in the Home; and that the Defendants have violated the ADA and FHA and abridged Plaintiffs Illinois State and federal Constitutional right to equal protection of the laws as aforesaid.

128.    If injunctive relief is not granted, Plaintiffs and the other prospective residents will sustain grievous and irreparable harm because they will have no safe and appropriate housing. St. Coletta's will be impaired in serving, indeed prevented from performing its mission with respect to providing safe, appropriate and beneficial housing and assistance to Mr. McMorris and to his fellow disabled prospective residents. St. Coletta's is also reasonably likely to sustain severe harm to its good will and reputation as well as the prospective loss of hundreds of thousands of dollars in funding essential to its mission.

129.    Plaintiffs have no adequate remedy at law.

WHEREFORE, the Plaintiffs respectfully request that this Court enter an order against the Defendants:

        a.   permanently enjoining the City, its officials and staff, including without limitation its Planning Commission and Mr. Goodlow, from interfering with the opening or operation of the Home or otherwise engaging in further unlawful discrimination and violations of Illinois State and federal Constitutional rights to equal protection of the law against the Plaintiffs and the other residents of the residential group home;

        b.   requiring Defendants to issue to Plaintiffs all the applied-for permit(s) to facilitate the prompt installation of a sprinkler system and/or fire alarm system for the Home;

        c.   requiring that the Defendants immediately restore residential water service to the Home; and

        d.   for such further appropriate equitable relief as the Court deems fair and just in the premises.

## COUNT VIII
### (Declaratory Judgment)

130.   Plaintiffs incorporate their allegations contained in Paragraphs 1-129 as and for their allegations for this paragraph as though fully set forth herein.

131.   Group homes are regulated by the Illinois Department of Human Services under 59 Ill. Admin. Code § 115 and in accordance with a comprehensive regulatory scheme set forth in the Community-Integrated Living Arrangements Licensure and Certification Act ("CILA") 210 ILCS 135/1 et seq., the express purpose of which

"is to promote the operation of community-integrated living arrangements for the supervision of persons with mental illness and persons with a developmental disability by licensing community mental health or developmental services agencies to provide an array of community-integrated living arrangements for such individuals. These community-integrated living arrangements are intended to promote independence in daily living and economic self-sufficiency."

(210 ILCS 135/2)

132.    The City of Markham is preempted from regulating Group Homes, including the Home, through, among other measures, requiring business licenses, requiring zoning changes or variances, imposing special use permit requirements, inspection requirements, fire safety, alarm system, sprinkler system or other regulations on the owners or operators of group homes, including St. Coletta's.

133.    Despite this preemption, Defendants have purported to regulate the Home, St. Coletta's and its residents through the various measures, acts, mandates and omissions to act set forth herein, such as refusing to issue St. Coletta's permits for fire alarm and sprinkler systems, imposing business license, zoning change, and/or other unlawful and preempted regulatory requirements.

134.    None of the City's and Defendants' requirements for the Home as alleged herein are based in or required by the City's Code or other ordinances, or any reasonable interpretation or application thereof.

WHEREFORE, the Plaintiffs respectfully request that this Court enter a declaratory judgment against the Defendants declaring and finding that:

      a.  the City, its officials and staff, including without limitation Defendants, are legally barred by preemption from imposing business license, zoning, special use building or other permit requirements or municipal mandates or regulations on St. Coletta's with respect to the Home;

38

b. the City's Code, and other ordinances do not permit its officials and staff, including without limitation Defendants, to impose business license, zoning, special use, building or other permit requirements or municipal mandates or regulations on St. Coletta's with respect to the Home; and

c. the City's Code, and other ordinances do not require that St. Coletta's apply for seek, obtain or maintain business licenses, zoning, special use, building or other permits or other municipal authority or permission to improve, establish, occupy, operate, use or maintain the Home as a residential group home, or to otherwise interfere with or influence establishment or use of the Home as a residential group home.

Dated:  March 5, 2008                    Respectfully Submitted,

                                         ST. COLETTA'S OF ILLINOIS, INC. and
                                         JESSE McMORRIS


                                         By:    /s/ Nicholas Anaclerio
                                                One of Plaintiffs' Attorneys

                                         Nicholas Anaclerio (ARDC #6187889)
                                         Jamie A. Robinson (ARDC #6270503)
                                         David Levitt (ARDC #6280466)
                                         Ungaretti & Harris LLP
                                         70 W. Madison Street, Suite 3500
                                         Chicago, Illinois 60602
                                         Tel.: 312.977.4400

39

# EXHIBIT 1

| | |
|---|---|
| | Markham, IL Code of Ordinances |
| TITLE XV: LAND USAGE | |
| CHAPTER 156: ZONING CODE | |

# CHAPTER 156: ZONING CODE

Section

*General Provisions*

156.001    Short title

156.002    Interpretation; purpose

156.003    Definitions

*District Boundaries*

156.015    Use districts established

156.016    Location and boundaries of districts

156.017    Annexed land

*Zoning Map; Standards*

156.030    Short title

156.031    Purpose

156.032    Identification of maps and standards adopted by reference

156.033    Official map adopted by reference

156.034    Official standards adopted by reference

156.035    Use of maps and standards in other ordinances

156.036    Comprehensive plan adopted

156.037    Administration and enforcement of subchapter

*R-1 One-Family Residential Districts*

156.050    Application of provisions

156.051    Permitted uses

This chapter shall be known as the zoning regulations of the city.

('77 Code, § 17.03.010)

## § 156.002  INTERPRETATION; PURPOSE.

(A)    In its interpretation and application, the provisions of this chapter shall be held to be minimum requirements adopted for the promotion of a comprehensive plan and designed to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to facilitate the adequate provision of transportation, water, sewerage, schools, parks and other public requirements; and to promote the public interest, health, comfort, convenience, safety or general welfare.

(B)    It is not intended by this chapter to interfere with or abrogate or annul any ordinance, rules, regulations or permits previously adopted or issued, and not in conflict with any of the provisions of this chapter, or which shall be adopted, or issued, pursuant to law relating to the use of buildings or premises, nor is it intended by this chapter to interfere with or abrogate or annul any easements, covenants or other agreements between parties.  However, where this chapter imposes a greater restriction upon the use of buildings or premises or upon height of buildings or requires larger open spaces than are imposed or required by such ordinances, rules, regulations or permits, or by easements, covenants, or agreements that the provisions of this chapter shall control.

('77 Code, § 17.03.020)

## § 156.003  DEFINITIONS.

For the purpose of this chapter, the following definitions shall apply unless the context clearly indicates or requires a different meaning.

*ACCESSORY BUILDING.*  A subordinate building, the use of which is clearly incidental to that of the main building or to the use of the land.

*ADJACENT.*  Nearby, but not necessarily touching.

*ALLEY.*  A public thoroughfare not more than 20 feet wide.

*APARTMENT.*  A suite of rooms, with cooking facilities and private bath and toilet facilities, used for living purposes. Each apartment is considered a dwelling unit.

*APARTMENT HOUSE.*  A building containing apartments.

*AREA OF A SIGN.*  That area in square feet of the smallest geometric figure or combination of regular geometric figures which figure or figures enclose both the copy and facing of the sign.

*AUTOMOBILE SERVICE STATION.*  A place of business having pumps and/or storage tanks from which liquid fuel and/or lubricants are dispensed at retail directly into the motor vehicle. Sales and installation of auto accessories, washing, polishing, inspections and cleaning, but not steam cleaning may be carried on incidental to the sale of such fuel and lubricants.

*BASEMENT.*  A story, partly underground, which has not more than one-half its height measured

from finished floor to finished ceiling above the average grade of the adjoining ground.

**BILLBOARD.** Any structure or portion thereof upon which a sign or advertisement used as an outdoor display for the purpose of making anything known is displayed. This definition does not include any bulletin boards used to display official court or public office notices.

**BLOCK.** That property abutting on one side of a street between the two nearest intersecting streets or other natural barriers.

**BOARDINGHOUSE.** A dwelling in which three, four, or five rooms are occupied as guest rooms and in which food may be served to the occupants thereof. Any dwelling in which more than five rooms are occupied as guest rooms is deemed to be a hotel. A boardinghouse does not include institutions for persons requiring physical or mental care by reason of age, infirmity or disease.

**BUILDING.** A structure having a roof supported by columns or walls.

**BUILDING AREA.** The total area, taken on a horizontal plane at the average grade level, of the principal buildings and all accessory buildings, exclusive of uncovered porches, terraces and steps.

**BUILDING HEIGHT.** The vertical distance measured from the natural grade level to the highest level of the roof surface of flat roofs, to the deck line of mansard roofs, or to the average height between eaves and ridge for gable, gambrel or hip roofs. The building height limitations of these zoning regulations shall not apply to church spires, belfries, cupolas, domes, monuments, water towers, chimneys, flues, vents, flag poles, radio towers, TV towers, public observation towers or airway beacons; nor to any bulkhead, elevator, water tank or similar structure extending above the roof and occupying an aggregate area of not greater than 25% of the horizontal projected roof area.

**BUILDING LINE.** A building line corresponds to the rear boundary of the front yard.

**BUILDING, MAIN.** A building in which is conducted the principal use of the lot on which it is situated.

**COMMERCIAL VEHICLE.** A passenger car, truck, or bus designed and operated for the purpose of monetary gain.

**CONTIGUOUS.** In contact with.

**COURT.** Any space other than a yard on the same lot with a building or group of buildings, and which is unobstructed and open to the sky above the floor level of any room having a window or door opening on such court. The width of a court shall be its least horizontal dimension.

**DEPTH OF REAR YARD.** The average horizontal distance between the rear line of the main building and the centerline of the alley or easement, otherwise the rear lot line.

**DISTRICT.** A portion of the city within which certain regulations and requirements or various combinations thereof apply under the provisions of these zoning regulations.

**DRIVE-IN RESTAURANT.** Any establishment where food or beverages are dispensed and where such food or beverages are consumed on the premises but not within a building.

*DWELLING, THEATER.* An open-air theater designed for viewing by the audience from motor vehicles.

*DWELLING, ONE-FAMILY.* Containing one dwelling unit.

*DWELLING UNIT.* A group of rooms or a room occupied or intended for human occupancy.

*ELECTRIC SIGN.* A sign served or energized with electric current for purpose of illumination or for any other purpose.

*FAMILY.* A group of one or more persons occupying a building and living and cooking in a single dwelling unit. No unrelated group living and cooking in a single dwelling unit shall consist of more than six persons, as distinguished from a group occupying a lodginghouse or hotel.

*FRONTAGE.* All property on one side of a street between two intersecting streets or other natural barriers.

*GARAGE, PRIVATE.* An accessory building designed for occupancy by the passenger motor vehicles of the family residing on the same lot. This may include one commercial vehicle under one ton capacity. Noncommercial vehicles of persons not resident on the lot may occupy up to one-half the capacity of such garage.

*GARAGE, PUBLIC.* Any building, other than that as a private garage, as defined above, used for the storage or care of motor vehicles, or where any such vehicles are equipped for operation, repaired, or kept for remuneration, hire or sale.

*GRADE, STREET.* The elevation of the center of a street in front of the center of a building as established by the City Engineer.

*GUEST ROOM.* A room occupied for hire by one or more persons in which no cooking facilities are provided.

*HOME OCCUPATION.* An occupation or a profession conducted for monetary gain which:

    (1)    Is customarily carried on within a dwelling unit;

    (2)    Is carried on by a member or members of the family residing in the dwelling unit;

    (3)    Is clearly incidental and secondary to the use of the dwelling unit for residential purposes;

    (4)    Conforms to the following additional conditions:

        (a)    The occupations or profession shall be carried on wholly within the principal building.

        (b)    No one outside of the family resident on the premises shall be employed in a home occupation.

        (c)    There shall be no exterior display or storage of materials, and no other exterior indication of the home occupation or variation from the residential character of the principal building.

The maps and standards adopted under §§ 156.033 and 156.034 may be adopted by reference to their titles in other ordinances which regulate the development of the municipality without further filing or publication except where the statutes require otherwise.

('77 Code, § 17.12.060)

## § 156.036  COMPREHENSIVE PLAN ADOPTED.

The "Comprehensive Plan, Markham, Illinois" as prepared by TecSearch, Inc. and approved by the Markham Plan Commission on March 5, 1969, is approved and adopted as the Official Comprehensive Plan for the city.

('77 Code, § 17.12.080)

## § 156.037  ADMINISTRATION AND ENFORCEMENT OF SUBCHAPTER.

Provisions of this chapter, including such maps and standards as are adopted by reference, which also may be incorporated by reference in other regulator ordinances shall be administered and enforced by the officers designated in such regulatory ordinances. Those provisions of this chapter not incorporated in other ordinances shall be enforced by the Mayor.

('77 Code, § 17.12.070)

# R-1 ONE-FAMILY RESIDENTIAL DISTRICTS

## § 156.050  APPLICATION OF PROVISIONS.

The regulations set out in this subchapter shall apply to all R-1 districts, and shall be subject to the provisions of §§ 156.245 through 156.257, 156.270 through 156.278 and 156.290 through 156.294.

('77 Code, § 17.15.010)

## § 156.051  PERMITTED USES.

The following uses are permitted in an R-1 district:

(A)  Customary accessory uses and buildings, including private garages, professional offices, and home occupations, provided such uses are incidental to the principal use and do not include the conduct of any retail sales on the premises or wholesale business or manufacturing.  An accessory building shall not include servants' quarters, guest rooms or sleeping rooms.

(B)  One single-family dwelling on any lot or parcel, which dwelling shall be of such size, bulk, and construction as to contain on the first floor thereof a minimum of 1,040 square feet of living floor area if such dwelling is of the single floor design; or 900 square feet of living floor area on the first floor if the dwelling is of the story and one-half or split-level design; or 800 square feet of living floor area on the first floor if the building is of the two-story design.

(C)  Temporary offices and/or construction sheds and uses incidental to a construction project on approval of location, size, and necessity, by the Mayor and City Council, but only for the duration of

such project, but not exceeding 12 months. Extension of such time limit may be renewed for six month periods upon a showing of necessity by the petitioner.

(D)    Truck gardening and other horticultural uses where no building is involved; all subject to the applicable health and sanitation regulations of this code and any other applicable ordinances of the city.

('77 Code, § 17.15.020)

## § 156.052  CONDITIONAL USES.

The following may also be permitted upon approval of their location and development by the Plan Commission.

(A)    School, elementary and high (public or private).

(B)    Churches and buildings usually associated with similar activities.

(C)    Publicly-owned and operated parks, playgrounds and other recreation uses, including eating and drinking, sales and service establishments accessory to the use of the above. However, no such accessory use shall be located closer than 100 feet to any adjacent residential property.

(D)    Governmental and public utility buildings and facilities when necessary for serving the surrounding territory; provided, that no public business offices and no repair or storage facilities are maintained therein.

(E)    Hospitals, clinics and sanitariums.

('77 Code, § 17.15.030)  (Am. Ord. 85-O-1166, passed 3-18-85; Am. Ord. 86-O-1205, passed 1-15-86)

## § 156.053  LOT AREA.

Each lot shall have a minimum width of 80 feet. The minimum lot area per dwelling unit shall be 9,000 square feet. No building with its accessory buildings shall occupy in excess of 30% of the area of an interior lot, nor in excess of 30% of the area of a corner lot.

('77 Code, § 17.15.040)

## § 156.054  YARD SPECIFICATIONS.

(A)    There shall be a front yard having a depth not less than that established by an existing main building on the nearest lot within 100 feet. However, on a lot between two lots each within 100 feet which lots have established front yards, then the minimum front yard shall be that established by a line joining the nearest front corner of the main building on one lot and the nearest front corner of the main building on the other lot. Nothing in this section shall require that a front yard be more than 35 feet in depth or to permit a front yard of less than 20 feet in depth. On a lot that is not within 100 feet of a lot with an established front yard, the front yard shall be not less than 25 feet.

(B)    There shall be a rear yard of not less than 10% of the depth of the lot. However, such rear yard shall be a minimum of ten feet in depth.

(C)    Two side yards shall be provided for each lot. The combined width of the two side yards shall be not less than 25% of the lot width, with a minimum width of eight feet for either side yard.

('77 Code, § 17.15.050)

## § 156.055  CORNER LOT.

Front yard requirements shall be complied with along both streets abutting corner lots except that the depth of the yard abutting the side street need not exceed 20 feet.

('77 Code, § 17.15.060)

## § 156.056  BUILDING HEIGHT LIMITATION.

No building shall be erected or altered to exceed 30 feet in height.

('77 Code, § 17.15.070)

# R-2 ONE-FAMILY RESIDENTIAL DISTRICTS

## § 156.065  APPLICATION OF PROVISIONS.

The following regulations set out in this subchapter shall apply to all R-2 districts, and shall be subject to the provisions of §§ 156.245 through 156.257, 156.270 through 156.278 and 156.290 through 156.294.

('77 Code, § 17.18.010)

## § 156.066  PERMITTED USES.

The following uses are permitted in an R-2 district:

(A)    One single-family dwelling on any lot or parcel which dwelling shall be of such size, bulk, and construction as to contain on the first floor thereof a minimum of 1,040 square feet of living floor area if such dwelling is of the single-floor design; or 810 square feet of living floor area on the first floor if the dwelling is of the story and one-half or split-level design; or 720 square feet of living floor area on the first floor if the dwelling is of the two-story design.

(B)    All uses permitted in the R-1 district.

('77 Code, § 17.18.020)

## § 156.067  LOT AREA.

Each lot shall have a minimum lot width of 70 feet. The minimum lot area per dwelling unit shall be 8,000 square feet. No building with its accessory buildings shall occupy in excess of 30% of the area of an interior lot, nor in excess of 30% of the area of a corner lot.

('77 Code, § 17.18.030)

## § 156.068  YARD SPECIFICATIONS.

The yard requirements specified in the R-1 residence districts shall be the requirements for the R-2 residence districts as if the same were set forth in this subchapter except that the side yard requirements shall be as follows:  Two side yards shall be provided for each lot. The combined width of the two side yards shall be not less than 25% of the lot width, with a minimum width of seven feet for either side yard.

('77 Code, § 17.18.040)

## § 156.069  CORNER LOT.

The corner lot requirements specified in the R-1 residence district shall be the requirements for the R-2 residence district as if the same were set forth in this subchapter.

('77 Code, § 17.18.050)

## § 156.070  BUILDING HEIGHT LIMITATION.

No building shall be erected or altered to exceed 30 feet in height.

('77 Code, § 17.18.060)

# R-3 ONE-FAMILY RESIDENTIAL DISTRICTS

## § 156.080  APPLICATION OF PROVISIONS.

The following regulations shall apply to all R-3 districts, and shall be subject to the provisions of §§ 156.245 through 156.257, 156.270 through 156.278 and 156.290 through 156.294.

('77 Code, § 17.21.010)

## § 156.081  PERMITTED USES.

The following uses are permitted in a R-3 district:

(A)    One single-family dwelling on any lot or parcel, which dwelling shall be of such size, bulk and construction as to contain on the first floor thereof a minimum of 960 square feet of living floor area if such dwelling is of the single-floor design; or 720 square feet of living floor area on the first floor if the dwelling is of the story and one-half, split-level, or two-story design;

(B)    All uses permitted in the R-2 district.

('77 Code, § 17.21.020)

## § 156.082  LOT AREA.

Each lot shall have a minimum lot width of 60 feet. The minimum area per dwelling unit shall be 7,200 square feet. No building with its accessory buildings shall occupy in excess of 30% of the area of an interior lot, nor in excess of 30% of a corner lot.

('77 Code, § 17.21.030)

## § 156.083  YARD SPECIFICATIONS.

The yard requirements specified in the R-1 residence districts shall be the requirements for the R-3 residence districts as if the same were set forth under this subchapter except that the side yard requirements shall be as follows: Two side yards shall be provided for each lot. The combined width of the two side yards shall be not less than 25% of the lot width, with a minimum width of six feet for either side yard.

('77 Code, § 17.21.040)

## § 156.084  CORNER LOT.

The corner lot requirements specified in the R-1 residence district shall be the requirements for the R-3 residence district as if the same were set forth under this subchapter.

('77 Code, § 17.21.050)

## § 156.085  BUILDING HEIGHT LIMITATION.

No building shall be erected or altered to exceed 30 feet in height.

('77 Code, § 17.21.060)

# R-3A ONE-FAMILY RESIDENTIAL DISTRICT

## § 156.095  APPLICATION OF PROVISIONS.

The following sections shall apply to all R-3A one-family use districts and shall be subject to the provisions of §§ 156.245 through 156.257, 156.270 through 156.278 and 156.290 through 156.294.

('77 Code, § 17.24.010) (Ord. 547, passed - -64)

## § 156.096  PERMITTED USES.

The following are permitted in an R-3A district:

(A)   One single-family dwelling on any lot or parcel, which dwelling shall be of such size, bulk, and construction as to contain on the first floor thereof a minimum of 1,050 square feet of living floor area if such dwelling is of the single-floor design; or 720 square feet of living area on the first floor if the dwelling is of the story and one-half, split-level, or two-story design.

(B)   All uses permitted in the R-3 district.

('77 Code, § 17.24.020) (Ord. 547, passed - -64)

### § 156.097 LOT AREA.

Each lot shall have a minimum width of 57 feet. The minimum lot area per dwelling unit shall be 6,600 square feet. No building with its accessory buildings shall occupy in excess of 30% of the area of an interior lot, nor in excess of 30% of a corner lot.

('77 Code, § 17.24.030) (Ord. 547, passed - -64)

### § 156.098 YARD SPECIFICATIONS.

The yard requirements specified are: There shall be a rear yard of not less than ten feet in depth. Two side yards shall be provided for each lot. The total width of the yards shall not be less than ten feet with a minimum of five feet for either side yard. There shall be provided a public utility easement of not less than six feet as measured from the rear lot line, and no buildings shall be erected closer than ten feet from the rear lot line.

('77 Code, § 17.24.040) (Ord. 547, passed - -64)

### § 156.099 CORNER LOT.

The corner lot requirements specified in the R-1 residence district shall apply to R-3A districts as if the same were set forth in this subchapter.

('77 Code, § 17.24.050) (Ord. 547, passed - -64)

### § 156.100 BUILDING HEIGHT LIMITATION.

No building shall be erected or altered to exceed 30 feet in height.

('77 Code, § 17.24.060) (Ord. 547, passed - -64)

## R-3B ONE-FAMILY TOWN HOME RESIDENTIAL DISTRICT

### § 156.105 DISTRICT REGULATIONS.

There is hereby established residential housing district R-3B, One-Family Town Home Residential District, with the following requirements:

(A)    That such homes as are proposed shall have a minimum of 12,000 square feet of living space;

(B)    That the lot size be a minimum of 524 feet wide with a depth of 105 feet;

(C)    That the setback on the west should be 25 feet from the lot line on Kedzie Avenue, on the east side the setback should be ten feet from the lot line and on the north and south the setback should be 25 feet from the lot line;

(D)    The building height shall not exceed 30 feet;

(E)    There should be a minimum of two parking spaces per unit and one parking space per unit for guests.

(F)    The 20-foot alley to the east of the lot should be vacated by the city from 157th Street to 158th Street, with the developer and such successor owners' association as may be created responsible for black-topping and maintenance of the former alley, the installation and maintenance of sewers therein, in perpetuity, granting to the city a perpetual easement for maintenance of such city facilities as may be underground therein and for payment to the city of sewer fees for each living unit;

(G)    The developer shall install a minimum of a six-inch water line from the west side of Kedzie Avenue to the nearest location on the east side of Kedzie Avenue, in accordance with state and county rules and regulations regarding work on, under, above and upon Kedzie Avenue; and

(H)    The developer must improve 158th Street with black-topping as a part of the project.

(Ord. 04-O-1808, passed 8-4-04)

# R-4 ONE-FAMILY RESIDENTIAL DISTRICT

## § 156.110  APPLICATION OF PROVISIONS.

The following regulations of this subchapter shall apply to all R-4 districts, and shall be subject to the provisions of §§ 156.245 through 156.257, 156.270 through 156.278 and 156.290 through 156.294.

('77 Code, § 17.27.010)

## § 156.111  PERMITTED USES.

The following uses are permitted in an R-4 district:

(A)    One single-family dwelling on any lot or parcel, which dwelling shall be of such size, bulk, and construction as to contain on the first floor thereof a minimum of 960 square feet of living floor area if such dwelling is of the single-floor design; or 720 square feet of living floor area on the first floor if the dwelling is of the story and one-half, split-level, or two-story design.

(B)    All uses permitted in the R-3 district.

('77 Code, § 17.27.020)

## § 156.112  LOT AREA.

Each lot shall have a minimum lot width of 45 feet. The minimum lot area per dwelling unit shall be 5,400 square feet. No building with its accessory buildings shall occupy in excess of 35% of the area of any interior lot, nor in excess of 35% of a corner lot.

('77 Code, § 17.27.030)

---

Markham, IL Code of Ordinances

TITLE XI: BUSINESS REGULATIONS

CHAPTER 110: GENERAL BUSINESS LICENSING

---

# CHAPTER 110: GENERAL BUSINESS LICENSING

Section

### General Provisions

110.01    Short title

110.02    Purpose; jurisdiction

110.03    Definitions

110.04    Nuisances

### Licensing Provisions

110.15    Scope of activity requiring license

110.16    Qualifications of applicants

110.17    Applications; forms; signatures

110.18    Issuance of receipts

110.19    Investigations

110.20    Approval of licenses

110.21    Procedure when license not approved

110.22    Renewal of license

110.23    Duplicate license; fee

110.24    License fee; established; duration; proration; refund

110.25    License fee schedule

110.26    Contents of license

110.27    Display of license and insignia

110.28    Change of location

110.29    Records and books to be kept

110.30    Transference of license

110.31    Duties of licensee

110.32    Termination of licenses

110.33    Revocation of licenses

110.34    Vehicle tag

*Administration and Enforcement*

110.40    Authority to enforce regulations

110.41    Investigations and inspections

110.42    Right of entry for inspection; reports

110.43    Provisional order; final order

110.44    Summary action

110.45    Appeal procedure

110.46    Liability of violator

110.99    Penalty

# GENERAL PROVISIONS

## § 110.01  SHORT TITLE.

This chapter shall be known and may be cited as the General Licensing Ordinance of the city.

('77 Code, § 5.02.010)  (Ord. 67-O-673, passed - -67)

## § 110.02  PURPOSE; JURISDICTION.

(A)    The express purpose of this chapter is to protect and safeguard the health, safety and welfare of the citizens of the city; to increase public confidence in legitimate commerce; to further ensure adequate and periodic provisions of essential governmental inspectional services; and to provide for an accurate record of regulated commercial activities within the city.

(B)    It is not intended by this chapter to repeal, abrogate, annul or in any way impair or interfere with existing provisions of other laws or ordinances, except those specifically repealed by the ordinance

codified in this chapter. Where this chapter imposes a greater restriction upon persons, premises or personal property than is imposed or required by such existing provisions of law, ordinance, contract or deed, the provisions of this chapter shall control.

('77 Code, § 5.02.020)  (Ord. 67-O-673, passed - -67)

## § 110.03  DEFINITIONS.

For the purpose of this chapter, the following definitions shall apply unless the context clearly indicates or requires a different meaning.

*ACCESSORY ACTIVITY.* An activity or use which is customarily incidental and/or subordinate to a principal activity. However, such an activity, if conducted separately and independently of the principal activity, would be subject to licensing under the provisions of this chapter and is included in the ownership of the establishment.

*BUSINESS.* Includes all kinds of vocations, occupations, professions, enterprises, establishments and all other kinds of activities and matters, together with all devices, machines, vehicles or appurtenances used therein, any of which are conducted for private profit, or benefit, either directly or indirectly, on any premises in the city, or anywhere else within its jurisdiction.

*CITY LICENSE COMMISSION* or *LICENSE COMMISSION.* The License Commission of the city.

*INSIGNIA* or its singular number *INSIGNE.* Any tag, plate, badge, emblem, sticker or any other kind of device which may be required for any use in connection with any license.

*LICENSE* or *LICENSEE.* Includes respectively the words *PERMIT* or *PERMITTEE* or the holder for any use or period of time of any similar privilege.

*OWNER.* Any individual, firm, association, partnership, corporation, trust or any other legal entity having sufficient proprietary interest in a commercial activity or establishment to maintain and manage it operations.

*PERSON.* Includes individual natural persons, partnerships, joint adventures, societies, associations, clubs, trustees, trusts or corporations; or any officers, agents, employees, factors or any kind of personal representatives of any thereof, in any capacity, acting either for himself, or for any other person, under either personal appointment or pursuant to law.

*PREMISES.* Includes all lands, structures, places and also the equipment and appurtenances connected or used therewith in any business, and also any personal property which is either affixed to, or is otherwise used in connection with, any such business conducted on such premises.

*PRINCIPAL ACTIVITY.* The activity or use which utilizes the major portion of gross floor and/or land area.

*USABLE AREA.* The sum total of the gross horizontal area of all of the several floors of a building measured in square feet from the exterior walls or from the centerline of party walls separating two buildings.

(1)   Usable area includes attic, balcony, mezzanine, basement, cellar and/or porch areas devoted in storage, equipment installation or accessory uses.

(2)   Open area directly essential to the sale, service or production activity of any establishment shall be included in the computation of gross usable area. However, open area devoted to vehicular customer parking or the handling of materials shall not be included.

(3)   The usable area of a principal activity may be deducted from the gross area in the computation of usable area of any accessory activity.

('77 Code, § 5.02.030)  (Ord. 67-O-673, passed  -  -67)

## § 110.04  NUISANCES.

No business, licensed or not shall be so conducted or operated as to amount to a nuisance in fact.

(Ord. 92-O-1432, passed 3-18-92)  Penalty, see § 110.99

# LICENSING PROVISIONS

## § 110.15  SCOPE OF ACTIVITY REQUIRING LICENSE.

(A)   It is unlawful for any person, either directly or indirectly, to conduct any business or nonprofit enterprise, or to use in connection therewith any vehicle, premises, machine or device, in whole or in part, for which a license or permit is required by this chapter or other law or ordinance of the city,

without a license or permit therefor being first procured and kept in effect at all times as required by this chapter or other law or ordinance of the city.

(B)   This chapter shall apply to all business in the nature of special sales for which a license is required by this chapter or other law or ordinance of the city and it is unlawful for any person, either directly or indirectly, to conduct any such sale except in conformity with the provisions of this chapter.

(1)   For the purpose of this chapter, any person is deemed to be in business or engaging in nonprofit enterprise, and thus subject to the requirements of this section and division (A), when he does one act of the following:

(a)   Selling any goods or service;

(b)   Soliciting business or offering goods or services for sale or hire;

(c)   Acquiring or using any vehicle or any premises in the city for business purposes;

(d)   Holds himself forth as being engaged in a business or an occupation;

(e)   Solicits patronage, actively or passively, for a business or occupation; or

(f)   Performs or attempts to perform any part of a business or occupation in the city; or

(g)    The holding of a garage or yard sale of used personal property.

(2)    The agents or other representatives of nonresidents who are doing business in the city shall be personally responsible for the compliance of their principals and of the businesses they represent with this chapter.

(3)    (a)    A license shall be obtained in the manner prescribed in this chapter for each branch establishment or location of the business engaged in, as if each such branch establishment or location were a separate business.

(b)    Each rental real property is deemed a branch establishment or separate place of business for the purposes of this chapter when there is a representative of the owner or the owner's agent on the premises who is authorized to transact business for such owner or owner's agent or there is a regular employee of the owner or the owner's agent working on the premises.

(4)    A person, engaged in two or more businesses at the same location shall not be required to obtain separate licenses for conducting each of such businesses but, when eligible, shall be issued one license which shall specify on its face all such businesses.

('77 Code, § 5.02.040) (Ord. 67-O-673, passed - -67)

(C)    Whenever in this code a license is required for the maintenance, operation or conduct of any business or establishment, or for doing business or engaging in any activity or occupation, any person or corporation shall be subject to the requirement if by himself or through an agent, employee, or partner, he holds himself forth as being engaged in the business or occupation; or solicits patronage therefor, activity or passively; or performs or attempts to perform any part of such business or occupation in the city.

(Ord. 92-O-1432, passed 3-18-92; Am. Ord. 97-O-1615, passed 9-3-97) Penalty, see § 110.99

## § 110.16 QUALIFICATIONS OF APPLICANTS.

The general standards set out in this section relative to the qualifications of every applicant for a city license shall be considered and applied by the City License Commission. The applicant shall comply with the following:

(A)    Be a citizen of the United States, or a declarant therefor as authorized by law.

(B)    Not, either individually, or as a member of any party, group, or organization, at the time of any such application for a license or special permit, advocate or resort to any practices subversive of or designed for the overthrow, destruction or sabotage of the government of the United States.

(C)    Not be in default under the provisions of this chapter or indebted or obligated in any manner to the city except for current taxes;

(D)    No license or permit shall be issued for the conduct of any business or performance of any act which would involve a violation of the zoning code of the city. No license shall be issued for the conduct of any business, and no permit shall be issued for any thing, or act, if the premises and building to be used for the purpose do not fully comply with the requirements of the city.

('77 Code, § 5.02.050) (Ord. 67-O-673, passed - -67)

(E)    No license shall be issued for the conduct of any business and no permit shall be issued for any thing or act, if the premises and building to be used for the purpose do not fully comply with the requirements of the city. No such license or permit shall be issued for the conduct of any business or performance of any act which would involve a violation of the zoning ordinances of the city. (Ord. 92-O-1432, passed 3-18-92)

## § 110.17  APPLICATIONS; FORMS; SIGNATURES.

(A)    (1)    Applications for all licenses and permits required by ordinance shall be made in writing to the City Clerk, on forms provided by that office, in the absence of provisions to the contrary. Each application shall state the name of the applicant, the permit or license desired, the location to be used, if any, the time covered and the fee to be paid; and each application shall contain such additional information as may be needed for the proper guidance of the city officials in the issuing of the permit or license applied for.

(2)    Applications for the conduct of a garage or yard sale shall be limited to bona fide residents of the City of Markham who have resided within the city for a minimum of one year at the location for which the license is sought.

(B)    There shall be a nonrefundable license application fee of $15 paid at the time of submission of the application for license with credit to be given on the license fee due upon approval of the application. There shall be a fee of $20 for each returned check, whether NSF or otherwise; failure to pay said charges immediately upon notification shall result in an administrative revocation of the license or denial of the application.

(C)    Forms for all licenses and permits, and applications therefor, shall be prepared and kept on file by the City Clerk.

(D)    Each license or permit issued shall bear the signatures of the Mayor and the City Clerk in the absence of any provision to the contrary.

(Ord. 92-O-1432, passed 3-18-92; Am. Ord. 97-O-1615, passed 9-3-97)

## § 110.18  ISSUANCE OF RECEIPTS.

At the time the application for a license is made, the City Clerk shall issue a receipt to the applicant for the money paid in advance. Such receipt shall not be construed as the approval for the issuance of a license nor shall it entitle or authorize the applicant to open or maintain any business contrary to the provisions of this chapter.

(B)    Upon the receipt of an application for a license or a permit, the Clerk shall within 48 hours of the time of such receipt refer such application to the Mayor for processing by the City License Commission.

(C)    A license for the conduct of a garage or yard sale may be summarily approved and issued by the City Clerk.

('77 Code, § 5.02.070) (Ord. 67-O-673, passed - -67; Am. Ord. 97-O-1615, passed 9-3-97)

## § 110.19  INVESTIGATIONS.

(A)     Upon the receipt of an application for a license or permit where ordinances of the city necessitate an inspection or investigation before the issuance of such permit or license, the City Clerk shall refer such application to the proper officer for making such investigation within 48 hours of the time of such receipt. The officer charged with the duty of making the investigation or inspection shall make a report thereon, favorable or otherwise, within ten days after receiving the application or a copy thereof. The Health Officer shall make or cause to be made an inspection in regard to such licenses in the connection of the care and handling of food and the preventing of nuisances and the spread of disease, for the protection of health; the Building Inspector shall make or cause to be made any such inspections relative to the construction of buildings or other structures. All other investigations except where otherwise provided, shall be made by the Chief of Police or by some other officer designated by the Mayor.

(B)     There shall be no investigation of the application for a garage or yard sale license except for the ascertaining by the City Clerk that the applicant has been a bona fide resident of the City of Markham at the stated location for the required period.

(Ord. 92-O-1432, passed 3-18-92; Am. Ord. 97-O-1615, passed 9-3-97)

## § 110.20  APPROVAL OF LICENSES.

(A)     The Mayor shall present all applications for license together with the recommendation of the City License Commission to the City Council. All licenses and permits authorized or required by this chapter or other ordinances of the city shall be granted by the Council which shall have the power to grant applications and to pass upon the sufficiency of any bond, where a bond is required.

(B)     Every license, when application therefor has been approved by the Council, shall be issued by the City Clerk, provided the prescribed fee is first paid and, where a bond is required, that the bond is properly approved and filed.

('77 Code, § 5.02.090) (Ord. 67-O-673, passed - -67)

## § 110.21  PROCEDURE WHEN LICENSE NOT APPROVED.

(A)     In the event the City Council refuses to grant an application for a license, or if the applicant does not pick up the license, the $10 service fee will be nonrefundable.

(B)     The City License Commission shall send written notification to the applicant of the refusal to grant the license.

(C)     Upon written request from the applicant received within ten days of notification of refusal to grant the license, the City License Commission shall schedule a hearing to receive additional information relative to determining the eligibility of the applicant for the business license requested.

(D)     When the issuance of a license is denied and any action is instituted by the applicant to compel its issuance, such applicant shall not engage in the business for which the license was refused unless a license be issued to him pursuant to a judgment ordering the same.

('77 Code, § 5.02.100) (Ord. 67-O-673, passed - -67; Am. Ord. 87-O-1271, passed 5-6-87)

# EXHIBIT 2



## CONCILIATION AGREEMENT

among

THE UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

and

Keesha Karriem, 15501 South Kedzie Avenue, Markham, IL 60428
Complainant

and

Mayor David Webb, City of Markham, 16313 Kedzie Parkway
Markham, IL  60428
Respondent

and

TyWayne Wilson, City of Markham, 16313 Kedzie Parkway
Markham, IL  60428
Respondent

HUD Case Number:    05-07-0062-8

Effective Date of Agreement    January 26, 2006

Expiration Date of Agreement:    December 31, 2008

000086

## I.    GENERAL PROVISIONS

1. On October 16, 2006, Keesha Karriem, Owner of Karriem's
   Development Services, Inc. hereinafter "the complainant")
   filed a complaint under the Fair Housing Act ("Act") against
   the City of Markham and in particular Mayor David Webb and
   Chairman TyWayne Wilson (hereinafter "respondents") alleging
   that on September 25, 2006, she received a citation and
   monetary fine from respondents for failure to obtain to a
   business license and operating a commercial business within
   a residential area.  Complainant owns and operates a
   developmental residential home for mental handicapped
   persons. She was issued a business license from the City on
   August 1, 2001.  Tenants of the housing are named aggrieved
   persons.  Although there has never been an incident of any
   kind involving herself or the tenants, complaint believes
   she is being targeted either by changing residents or City
   personnel for discriminatory purposes or reasoning.

   The allege discriminatory action is in violation of
   subsections 804(a), (b) and 818 of the Act.  (42 U.S.C
   Sections 3604((a), (b) and 3617.  The property at issue is
   located at 15501 South Kedzie Avenue, Markham, IL.  The
   Department and the named parties hereto wish to reach a just
   resolution of this dispute.  The parties agree that the
   negotiation of this Agreement shall constitute Conciliation
   pursuant to the Act and its implementing regulations at 24
   C.F.R. §§ 103.310,103.315 and 103.320.  It is understood and
   acknowledged that the respondents listed herein, page one, of
   this document represents the true and correct parties bound
   by this Agreement.

2. It is understood that this Agreement does not constitute an
   admission by respondents of any liability under or violation
   of the federal Fair Housing Act (42 U.S.C. 3601 et seq.).

3. The parties acknowledge that this Agreement is voluntary and
   full settlement of the disputed complaint.  No party has
   been coerced, intimidated, threatened, or in any way forced
   to become a party to this Agreement.  The parties have read
   and fully understand the significance of the terms set forth
   herein.

4. It is understood that respondents deny any violation of law,
   and that this Agreement does not constitute an admission by

2

000087

respondents or evidence of a determination by the Department of any violation of the Act or any other law.

5. The parties agree that, in the interest of speedily concluding this matter, this Agreement may be executed by the parties' signatures on separate pages. The separate signed pages will be attached to the body of the Agreement to constitute one document. To avoid delay, the parties agree that signature pages received via facsimile be considered official provided that the original copy of the signature page is forwarded to the Department immediately upon the signing of the Agreement. Both the original and the faxed signature pages will be retained in the official case file.

6. This Agreement will become effective on the date it is signed by the Director, Office of Fair Housing and Equal Opportunity, Chicago Field Office. The Director, acting on behalf of the Secretary of HUD, has the delegated authority to approve or disapprove this Agreement.

7. The term of this Agreement shall be two years from its effective date.

8. This Agreement is binding upon the U.S. Department of Housing and Urban Development; the complainant and her successors and assigns; and the respondents, their employees, heirs, successors and assigns and all others in active concert with the operation of City of Markham's Department of Business Licensing and Code Enforcement/Inspection.

9. Pursuant to Section 810(b)(4) of the Act, this Agreement shall become a public document. However, the Department will hold confidential all information of a personal or financial nature concerning parties to this Agreement that is not contained in the body of the Agreement.

10. No amendment to, modification of, or waiver of any provision of this Agreement shall be effective unless all the following conditions are met:

(a) all signatories to the Agreement are notified in advance of the proposed amendment, modification, or waiver; (b) the amendment, modification, or waiver is in writing; and (c) the amendment, modification, or waiver is approved and signed by the Director, Office of Fair Housing and Equal Opportunity, Chicago Field Office.

3

000088

Any such amendment, modification, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

## II.   MUTUAL RELEASE

11. In exchange for the compliance with the provisions of this Agreement, complainant and the Department hereby forever waives, releases, and covenants not to sue respondents, or pursue any administrative action against respondents, with respect to any matters which were alleged in or were within the scope of the allegations of this subject complaint filed with the Department or the list of deficiencies which were discovered or could have been discovered as part of the complaint and investigation by the Department.

12. This release does not apply to any rights arising from respondents' failure to comply with the terms of this Agreement or to other complaints or matters of compliance which may be pending with the Department, of which there are none.

13. In consideration of the execution of this Agreement, the complainant and the Department hereby forever waives, releases, and covenants not to sue respondents and their heirs, executors employees, assigns, agents, and attorneys with regard to any and all claims, damages and injuries of whatever nature whether presently known or unknown, including but not limited to, those arising out of the subject matter of HUD case number 05-07-0062-8, or which could have been filed in any action or suit arising from said subject matter.

## III.   NON-RETALIATION

14. Respondents agree not to retaliate against or interfere with complainant, or any other person, on account of their having filed, or aided in the filing of the complaint which led to this Agreement or in the exercise of any right under the Act or on account of their having aided or encouraged any other person in the exercise or enjoyment of their rights under the Act.

4

a.    RELIEF FOR COMPLAINANT

15. To fully and finally settle the alleged discrimination complaint, respondents agree to provide the following terms and conditions:

    i.    Respondents shall immediately cease and desist allowing harassment through the use of City personnel and citations of violations against the property at issue.

    ii.    Treat complainant and all aggrieved persons with dignity and respect.

    iii.    Not to interfere, harass, delay or treat less favorably complainant's future efforts to obtain business licensing, and/or to operate group home housing.

b.    COMPLIANCE BY COMPLAINANT

    i.    Complainant agrees that she and Karriem Development Services, Inc. will fully and completely comply with all requirements set forth in the City of Markham Code of Ordinances for operating a business within the City of Markham. This will include but is not limited to preparing and filing a business license application, appearing before the Zoning or Planning Commission, if requested, and the City Council, if requested, to present her business license application, paying all fees, submitting to and passing a Building Department inspection annually, and displaying a current City of Markham license at the business annually.

IV. ACTIONS IN THE PUBLIC INTEREST

16. Respondents acknowledge that The Fair Housing Act makes it unlawful:

- To utilize land use policies or actions that treat groups of persons with disabilities less favorably than groups of non-disabled persons. An example would be an ordinance or a

5

000090

specific type of disability, such as mental illness, from locating in a particular area, while allowing other groups of unrelated individuals to live together in that area.

- To take action against, or deny a permit, for a home because of the disability of individuals who live or would live there. An example would be denying a building permit for a home because it was intended to provide housing for persons with mental retardation.

- To refuse to make reasonable accommodations in land use and zoning policies and procedures where such accommodations may be necessary to afford persons or groups of persons with disabilities an equal opportunity to use and enjoy housing.

- What constitutes a reasonable accommodation is a case-by-case determination.

- Not all requested modifications of rules or policies are reasonable. If a requested modification imposes an undue financial or administrative burden on a local government, or if a modification creates a fundamental alteration in a local government's land use and zoning scheme, it is not a "reasonable" accommodation.

17. Within 30-days of the date on which this Agreement becomes effective, respondents agree to communicate the provisions of the Agreement to their respective employees, agents and all persons who have any responsibilities or duties related to the provisions of this Agreement, and to provide the Department with a certification that this requirement has been met.

## V.    COMPLIANCE

18. Complainant and respondents agree that the Department shall monitor compliance with the terms and conditions specified in this Agreement. As a part of such monitoring, the Department may require written reports concerning compliance, inspect the premises, examine witnesses, and examine and copy pertinent records of the respondents and complainant at any reasonable time during the term of this Agreement.

19. The parties understand that if the Department has reasonable cause to believe that respondents have breached this Agreement, the Department shall refer the matter to the Attorney General for enforcement of the terms of the Agreement pursuant to 42 USC 3610(c).

6

000091

## VI.  REPORTS AND RECORD KEEPING

20. This Agreement contains specific actions that are required of respondents.  These actions must be completed within the specified time frames, and the Department must verify satisfactory completion.  It is understood that this Agreement will serve as the basic notice of the required contents of and deadlines for progress reports.  Failure to provide documentation of compliance with the terms of this Agreement constitutes a breach of the Agreement, and may result in referral of the matter to the Attorney General for enforcement proceedings.  Provided, however, before any such referral is made, respondents shall have a 30-day period to cure any such deficiency or breach.

21. As directed by this Agreement, all required certifications and documentation of compliance must be submitted to: U.S. Department of Housing and Urban Development Office of Fair Housing and Equal Opportunity ATTENTION: CONCILIATION REVIEW 77 West Jackson Boulevard Street, Suite 2101, Chicago, IL, 60604-3507.

7

000092

## VII. SIGNATURES

Pages one through seven constitutes the entire Agreement between the parties, except for the relief that is to be offered and executed under this Agreement.

_Keesha Karriem_       1/16/07
Complainant Keesha Karriem            Date

_____
Respondent Mayor David Webb, City of Markham      Date

_____
Respondent Chairman TyWayne Wilson, City of Markham      Date

Approved on behalf of the Secretary

_Barbara M. Knox_            1/26/200;
Barbara M. Knox, Director          Date
Fair Housing and Equal Opportunity Direct, Region V

PROPERTY AT ISSUE: 15501 South Kedzie Avenue, Markham, IL

8

000093

## VII. SIGNATURES

Pages one through seven constitutes the entire Agreement between the parties, except for the relief that is to be offered and executed under this Agreement.

---

Complainant Keesha Karriem                                              Date

X _____        1-25-07
Respondent Mayor David Webb, City of Markham              Date

X _____        1-25-07
Respondent Chairman TyWayne Wilson, City of Markham      Date

Approved on behalf of the Secretary

_____        1/26/07
Barbara M. Knox, Director                                        Date
Fair Housing and Equal Opportunity Direct, Region V

PROPERTY AT ISSUE:   15501 South Kedzie Avenue, Markham, IL

8

000094